Filed 4/18/17

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

McDERMOTT WILL & EMERY LLP
et al.,

    Petitioners,

      v.

THE SUPERIOR COURT OF ORANGE
COUNTY,

    Respondent;

RICHARD P. HAUSMAN, SR., et al.,

    Real Parties in Interest.

G053623

(Super. Ct. Nos. 30-2015-00785773
& 30-2015-00785872)

O P I N I O N

Original proceedings; petition for a writ of mandate to challenge two orders of the Superior Court of Orange County, Sheila Fell, Judge.  Petition denied.

Gibson, Dunn & Crutcher, James P. Fogelman, Julian W. Poon, Shannon E. Mader and Jennafer M. Tryck for Petitioners.

No appearance for Respondent.

Sall Spencer Callas & Krueger, Robert K. Sall, Suzanne Burke Spencer and Michael A. Sall for Real Parties in Interest.

\*        \*        \*

In this original proceeding, we consider several issues relating to a confidential attorney-client communication, including (1) whether the client waived the attorney-client privilege by disclosing the communication to third parties, and (2) whether the trial court erred in disqualifying the law firm that represented one of those third parties because its attorneys failed to notify the client or the client's attorney that counsel had obtained a copy of the communication, reviewed and analyzed the communication, and used it in the lawsuit.

The trial court found that plaintiff and real party in interest Richard P. Hausman, Sr. (Dick),[1] did not waive the attorney-client privilege by forwarding a confidential e-mail he received from his personal attorney to his sister-in-law because Dick inadvertently and unknowingly forwarded the e-mail from his iPhone, and therefore lacked the necessary intent to waive the privilege. The trial court also impliedly found that Dick's sister-in-law did not waive the privilege when she forwarded the e-mail to her husband, who then shared it with four other individuals, because neither Dick's sister-in-law nor his brother-in-law could waive Dick's attorney-client privilege, and Dick did not consent to these additional disclosures because he did not know about either his initial disclosure or these additional disclosures until a year after they occurred.

In a separate order, the trial court disqualified Gibson, Dunn & Crutcher LLP (Gibson Dunn) from representing defendants and petitioners McDermott Will & Emery LLP and Jonathan C. Lurie (collectively, Defendants) in the underlying lawsuits because Gibson Dunn failed to recognize the potentially privileged nature of the e-mail after receiving a copy from Lurie, and then analyzed and used the e-mail despite

---

[1]    The other plaintiffs and real parties in interest are Mary Jo Hausman (Mary Jo), John Gavin Hausman (John), and Teresa Lynn Hausman (Teri). Because members of the same family are involved in this matter, we use their first names for the sake of clarity, and no disrespect is intended. We collectively refer to Dick, Mary Jo, John, and Teri as Plaintiffs.

2

Dick's objection that the e-mail was an inadvertently disclosed privileged document. The court explained Gibson Dunn had an ethical obligation to return the privileged material and refrain from using it under *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 (*State Fund*). The court found Gibson Dunn's disqualification was necessary because there was a genuine likelihood Gibson Dunn's improper use of the e-mail would affect the outcome of the lawsuit, the integrity of the judicial proceedings, and the public's confidence in the proceedings.

Defendants petition this court for a writ of mandate directing the trial court to vacate both its order finding Dick did not waive the attorney-client privilege as it applied to the e-mail, and its order disqualifying Gibson Dunn from representing Defendants in the underlying lawsuits. We deny the petition in its entirety. As we explain below, substantial evidence supports the trial court's orders and the court did not abuse its discretion in selecting disqualification as the appropriate remedy to address Gibson Dunn's violation of its *State Fund* duties.

Contrary to Defendants' contention, an attorney's *State Fund* duties are not limited to inadvertently disclosed, privileged documents the attorney receives from opposing counsel, but also may apply to documents the attorney receives from the attorney's client. Indeed, regardless of how the attorney obtained the documents, whenever a reasonably competent attorney would conclude the documents obviously or clearly appear to be privileged and it is reasonably apparent they were inadvertently disclosed, the *State Fund* rule requires the attorney to review the documents no more than necessary to determine whether they are privileged, notify the privilege holder the attorney has documents that appear to be privileged, and refrain from using the documents until the parties or the court resolves any dispute about their privileged nature. The receiving attorney's reasonable belief the privilege holder waived the privilege or an exception to the privilege applies does not vitiate the attorney's *State Fund* duties. The trial court must determine whether the holder waived the privilege or an exception

3

applies if the parties fail to reach an agreement. The receiving attorney assumes the risk of disqualification when that attorney elects to use the documents before the parties or the trial court has resolved the dispute over their privileged nature and the documents ultimately are found to be privileged.

I

FACTS AND PROCEDURAL HISTORY

A.     *The Hausman Family, Defendants' Legal Representation, and the Dispute Over M. Hausman, Inc.*

Marilyn H. Hausman and her husband, Dick, had four children, Mary Jo, John, Teri, and Richard P. Hausman, Jr. (Rick). The primary source of the couple's considerable wealth was Marilyn's multi-million dollar investment portfolio. In 2000, Marilyn formed a holding corporation, M. Hausman, Inc. (MHI), to manage her portfolio. Marilyn was MHI's sole shareholder and director, and also served as its president. Dick served as the officer primarily responsible for making and managing MHI's investments, and joined Marilyn as a director in 2002. A few years later, Rick and William J. Cox also became directors of MHI. According to Dick, the value of MHI's portfolio grew to approximately $50 million under his management.

In approximately 2002, Marilyn and Dick hired Defendants to provide a variety of estate planning services for their family. Over the years, Lurie formed several trusts and subtrusts for Marilyn and Dick, and the assets of those trusts included the shares in MHI. Dick, Rick, and Cox were appointed as cotrustees for many of these trusts, and the trust beneficiaries included the four Hausman children and Marilyn's mother. As part of their representation of the Hausman family, Defendants also represented MHI on corporate, employment, and other miscellaneous matters.

Marilyn died in June 2008, and Dick succeeded her as MHI's president. Rick and Cox also became vice presidents at that time. Over the next several years, MHI

4

continued to operate under the direction of Dick, Rick, and Cox, and Defendants continued to represent the members of the Hausman family and MHI.

In 2013, Dick agreed to Rick's request to be named MHI's president so Rick could gain experience in managing MHI, but Dick continued to perform many of the president's essential functions. Soon after becoming president, Rick sought to dramatically increase his and Cox's salaries and other benefits, but Dick objected because he thought the substantial increases were not in MHI's best interests or the best interest of the various trust beneficiaries. A struggle for control of MHI ensued and Dick, Rick, and Cox engaged in protracted discussions attempting to resolve their dispute. To advise him in these discussions and about his options under the various trusts, Dick hired his own attorney, Mark Blaskey.

On August 22, 2013, Dick, Rick, Cox, Blaskey, and Lurie met to discuss their disagreement. Immediately after that meeting, Dick, Blaskey, and Jill Lindsay met to review their options. Lindsay was MHI's employee and bookkeeper, but she also performed a variety of services for the various Hausman trusts and she was Dick's longtime personal assistant and advisor. Lindsay worked for Dick for nearly 40 years, starting as his executive secretary when he was an executive with Allergan and then working personally for him after he left the company. In her capacity as Dick's personal assistant, Lindsay regularly received and maintained correspondence on Dick's behalf.

B. *The Blaskey E-mail*

On August 27, 2013, Blaskey sent Dick a lengthy e-mail summarizing the August 22 meeting and providing legal advice to Dick about his options for resolving the dispute. Blaskey entitled the e-mail "Summary of 8/22/13 meeting," and copied Lindsay and his law partner, Alan Kessel. He copied Lindsay on the e-mail because she was responsible for maintaining Dick's correspondence. Lindsay replied to all recipients the same day.

The following day Dick forwarded the Blaskey e-mail from his iPhone to "'Mr. & Mrs. Gavin Shearer Herbert" at Ninetta Herbert's e-mail address. Dick's transmission did not include any additional text other than "Sent from my iPhone." That same day Ninetta forwarded the e-mail to Gavin at his e-mail address. Gavin was Marilyn's brother and Dick's brother-in-law. Gavin had not been involved in the various Hausman trusts or MHI for many years, but he was attempting to act as an intermediary or informal mediator to resolve the dispute between Dick, Rick, and Cox. Gavin engaged in several discussions with these individuals and also Lurie and Blaskey about the dispute.

Dick testified he did not intend to forward the Blaskey e-mail to Ninetta or Gavin, and did not know he had done so until the forwarded e-mail came to light approximately a year later. Dick was nearly 80 years old when he forwarded the e-mail and he explained multiple sclerosis had limited his physical dexterity. Gavin testified he did not recall receiving the Blaskey e-mail and he had not read it before it was shown to him at his deposition. He further testified that he had no idea why Dick would forward the e-mail to Ninetta, that doing so must have been a mistake, and that he never discussed the e-mail with Dick. Finally, Gavin testified he could not find a copy of the Blaskey e-mail when he was later asked to do so.

On September 4, 2013, Rick, Cox, and Greg Pellizzon, a financial advisor who was working with MHI, met with Gavin to discuss the ongoing dispute. According to Rick and Pellizzon, Gavin passed out copies of the Blaskey e-mail at this meeting and described them as minutes from the August 22 meeting. Gavin testified he had no recollection of this. Pellizzon testified he read the e-mail during the meeting, but did not keep a copy. During this meeting, Gavin also phoned Lurie to discuss the dispute and later that day forwarded the Blaskey e-mail to Lurie, although Gavin testified he did not recall this. Lurie testified he had some discussions with Gavin about the e-mail's contents.

6

C.      *The Probate Action*

Unable to resolve the dispute with Rick and Cox, Dick exercised a power he believed he held under the various trusts to reacquire all of MHI's voting shares and seize control of the company. Lurie, however, asserted Dick could no longer reacquire MHI's voting shares because Lurie had eliminated that option under the trusts' terms shortly after Marilyn's death. In October 2013, Dick filed a probate petition to confirm the actions he had taken to reacquire all MHI voting shares under the various Hausman family trusts (hereinafter, Probate Action).

In August 2014, Rick's counsel in the Probate Action, Jason Kirby, discovered a copy of the Blaskey e-mail among Rick's documents as he prepared to respond to Dick's demand to produce documents. Kirby pulled the e-mail and separately sent it to Dick's counsel, Alan Kessel, with a letter explaining the e-mail appeared to be a privileged communication between Blaskey and Dick, but that Dick later waived the privilege by forwarding it to Ninetta and Gavin. The letter further explained that Rick obtained a copy of the e-mail when Gavin handed it out at the September 4, 2013 meeting involving Rick, Cox, Pellizzon, and Gavin. Kirby asked whether Dick's counsel would claim the Blaskey e-mail still was privileged, and if so, for authority supporting that contention. Finally, Kirby assured Dick's counsel he had not used or disclosed the contents of the e-mail. This letter was the first time Dick and his attorney learned the Blaskey e-mail had been forwarded to anyone other than the original recipients, and they did not yet know the e-mail also had been forwarded to Lurie.

Dick's attorney, Kessel, responded that the Blaskey e-mail was a privileged attorney-client communication, and that Dick inadvertently disclosed the e-mail to Ninetta without intending to waive the privilege. Dick's counsel explained that Dick rarely communicated with Ninetta and never talked to her about MHI affairs, and therefore he inadvertently forwarded the e-mail to Ninetta when he was trying to forward it to Lindsay. Based on *State Fund* and *Rico v. Mitsubishi Motors Corp.* (2007)

7

42 Cal.4th 807 (*Rico*), Dick's counsel argued Kirby had an ethical obligation to return the inadvertently disclosed e-mail and destroy any copies. Dick's counsel also asked Kirby to contact any other party he knew had received a copy of the Blaskey e-mail, including Ninetta, Gavin, and Pellizzon, and direct them to destroy their copies.

Kirby argued neither *Rico* nor *State Fund* applied because those cases did not involve a client waiving the privilege by disclosing a communication to third parties before any litigation arose. Nonetheless, Kirby agreed to destroy all copies of the Blaskey e-mail except one, to seal that copy, and only use the copy to resolve the parties' dispute over whether Dick had waived the attorney-client privilege. Kirby also promised not to question anyone about the e-mail's content until the parties resolved the waiver issue. Finally, Kirby asserted he had no obligation to ask third parties to return the Blaskey e-mail. All parties to the Probate Action honored this agreement for several months.

In late July 2015, Defendants produced several thousand pages of documents in the Probate Action based on Dick's subpoena, and that production included a copy of the Blaskey e-mail that Gavin had forwarded to Lurie in September 2013. On August 13, 2015, the parties deposed Lurie in the Probate Action, and James Fogelman of Gibson Dunn represented Lurie in the deposition. When Rick's counsel questioned Lurie about the copy of the Blaskey e-mail that was included in Defendants' document production, Dick's attorney, Paul George, immediately objected that the e-mail was privileged and should not be used in the deposition. George also explained that Dick's other attorney, Kessel, had asked Rick's counsel to return all copies of the e-mail. This was the first time Dick and his counsel learned the Blaskey e-mail had been forwarded to Lurie.

Fogelman claimed the Blaskey e-mail was not privileged and asserted neither he nor Defendants had ever been asked to return it. To remove any doubt, Dick's counsel therefore requested that Fogelman and his clients return all copies of the Blaskey

8

e-mail because Dick inadvertently disclosed the privileged communication and all attorneys, including Lurie, had an ethical obligation to return or destroy inadvertently disclosed, privileged communications. Fogelman refused to return or destroy the Blaskey e-mail, disputing it was privileged because Dick had disclosed it to third parties, including Ninetta, Gavin, and Lindsay. Fogelman claimed an attorney's ethical obligation to return inadvertently disclosed documents only applied to documents that were inadvertently produced during discovery. Dick's counsel disagreed and the deposition continued. Lurie testified he reviewed the e-mail to refresh his recollection before the deposition, but he did not specifically testify about the e-mail's content.

D.    *The Malpractice Actions*

In May 2015, Plaintiffs filed two malpractice lawsuits against Defendants based on an alleged conflict in representing various members of the Hausman family, the Hausman family trusts, and MHI (collectively, Malpractice Actions). They brought one suit in their individual capacities and as trustees under certain Hausman family trusts. They brought the second lawsuit as a derivative action on MHI's behalf. Dick has different counsel in the Malpractice Actions than he had in the Probate Action, and Defendants are represented in the Malpractice Actions by Fogelman and Gibson Dunn.

On August 19, 2015, less than a week after Lurie's deposition in the Probate Action, Gibson Dunn deposed Lindsay in the Malpractice Actions. Lindsay testified she worked for MHI, the Hausman family trusts, and Dick personally at the time she received the Blaskey e-mail.

Five days later, Gibson Dunn deposed Mary Jo in the Malpractice Actions. Fogelman marked the Blaskey e-mail as an exhibit, sought to question Mary Jo about it, and read substantial portions of it into the record. Dick's attorney, Suzanne Burke Spencer, explained she was not familiar with the document or how it was produced, but she asserted it was a privileged, attorney-client communication that appeared to have

9

been produced inadvertently and she requested that Fogelman return all copies. He disputed that the e-mail was privileged or that either Lurie or Gibson Dunn had an obligation to return the e-mail because Dick had disclosed it voluntarily to various third parties. Spencer maintained her privilege objection and demand for the return of the e-mail, but stated she would allow questions about the e-mail subject to a motion to strike once she learned the circumstances surrounding the communication and its disclosure. Fogelman failed to inform Spencer that Dick's attorney in the Probate Action had raised the same objections less than two weeks earlier at Lurie's deposition in that separate lawsuit, nor did he inform her of the agreement the parties in that lawsuit reached about the e-mail. The following day, Gibson Dunn deposed Teri in the Malpractice Actions with Fogelman and Spencer engaging in essentially the same exchange. On August 24, 2015, Fogelman also quoted the Blaskey e-mail in interrogatory responses he served on Defendants' behalf.

On September 4, 2015, Spencer wrote Fogelman to explain the Blaskey e-mail remained a privileged communication between Dick and Blaskey. Spencer explained Lindsay's inclusion on the e-mail did not destroy the privilege because she received it as Dick's personal assistant, Dick's inadvertent disclosure of the e-mail did not waive the privilege because he did not intend to disclose the e-mail to Ninetta or anyone else, and the disclosure of the e-mail by various third parties was done without Dick's consent. Spencer further explained that Rick's counsel in the Probate Action recognized the privileged nature of the Blaskey e-mail and brought it to the attention of Dick's counsel even though Rick's counsel also asserted the privilege had been waived. The attorneys in the Probate Action then agreed to preserve the e-mail's privileged status while they attempted to resolve the dispute over whether Dick waived the privilege. Spencer also asserted Fogelman knew Dick had claimed the e-mail was privileged and demanded its return because Fogelman had attended Lurie's deposition in the Probate Action, but Fogelman nonetheless used the e-mail at Mary Jo's and Teri's depositions in

10

the Malpractice Actions without informing her about those objections. Finally, based on *Rico* and *State Fund*, Spencer asserted Fogelman had an ethical obligation to return or destroy all copies of the Blaskey e-mail and she demanded that he do so immediately.

After receiving Spencer's letter, Fogelman agreed that Gibson Dunn would temporarily stop using the Blaskey e-mail while the parties conducted discovery about the circumstances surrounding the e-mail and its disclosure. Nonetheless, Gibson Dunn produced a copy of the Blaskey e-mail as part of a larger document production in the Malpractice Actions on September 14, 2015.

During September and October 2015, Spencer conducted discovery about the Blaskey e-mail, but asserted additional discovery was still required on the waiver issue, including Lurie's deposition. In mid-November 2015, Fogelman wrote Spencer claiming Dick had been given sufficient time to explore the circumstances surrounding the e-mail and its disclosure, and none of the information uncovered established the Blaskey e-mail was a privileged communication. Fogelman therefore announced Gibson Dunn would resume using the e-mail.

E.  *The Privilege and Disqualification Motions*

In early December 2015, Dick filed a motion in the Malpractice Actions seeking (1) a judicial determination that the Blaskey e-mail was a privileged attorney-client communication that Dick inadvertently disclosed, and (2) an order requiring Gibson Dunn to return all copies of the e-mail and striking those portions of Mary Jo's and Teri's depositions where Fogelman asked questions about the e-mail and read portions of it into the record. Defendants opposed the motion, arguing the Blaskey e-mail never was privileged based on Lindsay's inclusion as an original recipient, and Dick nonetheless waived the attorney-client privilege by disclosing the e-mail to third parties. In support, Defendants filed a copy of the Blaskey e-mail under seal. In March 2016, the trial court granted Dick's motion, and ordered Defendants to seal or

11

return all copies of the Blaskey e-mail and seal the relevant portions of Mary Jo's and Teri's deposition transcripts. Dick served notice of entry of the order on March 15, 2016.[2]

Less than two weeks later, Dick filed a motion to disqualify Gibson Dunn from representing Defendants in the Malpractice Actions based on its use of the Blaskey e-mail and its refusal to return it. Gibson Dunn opposed the motion, arguing it was not readily apparent from the face of the e-mail that it was an inadvertently disclosed, privileged document. Gibson Dunn further argued its disqualification was not warranted because there was no evidence its review and initial failure to return the e-mail would substantially impact the litigation. On May 25, 2016, the trial court granted Dick's motion and disqualified Gibson Dunn from representing Defendants in the Malpractice Actions. The court stayed its ruling for 30 days to allow Defendants to petition this court for relief.

On June 6, 2016, Defendants filed this writ petition seeking a writ of mandate compelling the trial court to vacate (1) its order deeming the Blaskey e-mail privileged, and (2) its order disqualifying Gibson Dunn as Defendants' counsel in the Malpractice Actions. Defendants also sought a stay of all trial court proceedings pending the resolution of this writ petition. We granted the stay request and issued an order to show cause why a writ of mandate should not issue.

---

[2]     Dick did not file a similar motion in the Probate Action, and that case settled shortly after the ruling on the privilege motion in the Malpractice Actions.

12

## II

A.   *The Blaskey E-mail Was a Privileged Attorney-Client Communication and Dick Did Not Waive the Privilege*

    1.   We May Review the Trial Court's Privilege Ruling Because It Is Inextricably Intertwined with the Disqualification Ruling

Dick contends we should deny Defendants' challenge to the trial court's ruling that the Blaskey e-mail is privileged because Defendants filed their writ petition more than 60 days after Dick served notice of that ruling. Despite the timing, we will consider Defendants' arguments challenging the privilege ruling on the merits because it is inextricably intertwined with the disqualification ruling and Dick fails to show any prejudice.

Although there is no statutory time limit on a common law writ petition, appellate courts generally apply the same 60-day time limit applicable to appeals. But unlike appeals, appellate courts have discretion to decide a writ petition filed after the 60-day period, and typically look to whether there is any prejudice to the opposing party in doing so. (*People v. Superior Court (Lopez)* (2005) 125 Cal.App.4th 1558, 1562-1563.) Here, Dick fails to identify how deciding Defendants' challenge to the privilege ruling will prejudice him.

More importantly, when deciding a timely writ petition challenging a trial court ruling, an appellate court also may review an unchallenged earlier ruling if it is inextricably intertwined with the issues presented on the writ petition. (*Travelers Property Casualty Co. of America v. Superior Court* (2013) 215 Cal.App.4th 561, 573, fn. 17.) Here, the question whether the Blaskey e-mail was privileged is a "predicate issue[]" we must resolve before determining whether the trial court erred in disqualifying

13

Gibson Dunn for reviewing and using the e-mail.  (*State Fund*, *supra*, 70 Cal.App.4th at p. 651.)  We therefore must resolve the privilege question on the merits.

       2.       Legal Principles Governing the Attorney-Client Privilege

       The attorney-client privilege is a legislative creation, which courts have no power to expand or limit by implying exceptions.  (*Costco Wholesale Corp. v. Superior Court* (2009) 47 Cal.4th 725, 739 (*Costco*); *McKesson HBOC, Inc. v. Superior Court* (2004) 115 Cal.App.4th 1229, 1236.)  Based on the privilege, a client may refuse to disclose, and may prevent others from disclosing, confidential communications between a client and his or her attorney.  (Evid. Code, § 954.)

       A "'confidential communication between client and lawyer'" is statutorily defined as "information transmitted between a client and his or her lawyer in the course of that relationship and in confidence by a means which, so far as the client is aware, discloses the information to no third persons other than those who are present to further the interest of the client in the consultation or those to whom disclosure is reasonably necessary for the transmission of the information or the accomplishment of the purpose for which the lawyer is consulted, and includes a legal opinion formed and the advice given by the lawyer in the course of that relationship."  (Evid. Code, § 952.)

       "Once the proponent makes a prima facie showing of a confidential attorney-client communication, it is presumed the communication is privileged and the burden shifts to the opponent to establish waiver, an exception, or that the privilege does not for some other reason apply."  (*DP Pham, LLC v. Cheadle* (2016) 246 Cal.App.4th 653, 659-660 (*Pham*); see Evid. Code, § 917, subd. (a); *Costco*, *supra*, 47 Cal.4th at p. 733.)

       The attorney-client privilege may be waived, but only by the holder of the privilege.  (*Pham*, *supra*, 246 Cal.App.4th at p. 668.)  A waiver results when the holder, without coercion, (1) has disclosed a significant part of the communication, or (2) has

14

consented to the disclosure made by anyone else. (Evid. Code, § 912, subd. (a); *State Fund*, *supra*, 70 Cal.App.4th at p. 652.) Under the second method of waiver, "Consent to disclosure is manifested by any statement or other conduct of the holder of the privilege indicating consent to the disclosure, including failure to claim the privilege in any proceeding in which the holder has legal standing and the opportunity to claim the privilege." (Evid. Code, § 912, subd. (a).)

"Despite the statute's declaration that any uncoerced 'disclosure' creates a waiver, courts have consistently held that inadvertent disclosures do not." (*Newark Unified School Dist. v. Superior Court* (2015) 245 Cal.App.4th 887, 900 (*Newark*).) As the Supreme Court explains, "the disclosure contemplated in Evidence Code section 912 involves some measure of choice and deliberation on the part of the privilege holder." (*Ardon v. City of Los Angeles* (2016) 62 Cal.4th 1176, 1188 (*Ardon*); see *id.* at p. 1189 [Evid. Code § 912, subd. (a), requires "a voluntary and knowing disclosure" to waive privilege].) Similarly, in *State Fund*, the Court of Appeal concluded a waiver of the attorney-client privilege occurs only when there is an "intention to voluntarily relinquish a known right." (*State Fund*, *supra*, 70 Cal.App.4th at p. 653; see *Newark*, at p. 900 [*State Fund* "read into the statute the requirement that a disclosure be '[]intentional,' notwithstanding the failure of section 912 to distinguish between intentional and inadvertent disclosures. . . . This is consistent with the long-standing principle that a privilege is not waived in the absence of a manifest intent to waive"].)

The privilege holder's characterization of his or her intent in disclosing a privileged communication is an important consideration in determining whether the holder waived the privilege, but is not necessarily dispositive. (*Ardon*, *supra*, 62 Cal.4th at pp. 1190-1191.) When determining whether an inadvertent disclosure waived the attorney-client privilege, a trial court must examine both the subjective intent of the privilege holder and any manifestation of the holder's intent to disclose the information. (*Ibid.*; *State Fund*, *supra*, 70 Cal.App.4th at pp. 652-653.) Other relevant considerations

15

include the precautions the holder took to ensure the privilege was maintained and the promptness with which the holder sought return of the inadvertently disclosed document. (*Ardon*, at p. 1191; *State Fund*, at p. 653.)

"'"'When the facts, or reasonable inferences from the facts, shown in support of or in opposition to the claim of privilege are in conflict, the determination of whether the evidence supports one conclusion or the other is for the trial court, and a reviewing court may not disturb such finding if there is any substantial evidence to support it.'"'" (*Pham*, *supra*, 246 Cal.App.4th at p. 664; see *Kerner v. Superior Court* (2012) 206 Cal.App.4th 84, 110.) Defendants contend we should employ the de novo standard in reviewing the trial court's ruling because the facts are undisputed, and whether Dick waived the attorney-client privilege is therefore strictly a question of law. (See generally *Ghirardo v. Antonioli* (1994) 8 Cal.4th 791, 799.) Not so.

As explained below, there is conflicting evidence on whether Dick intended to waive the attorney-client privilege and competing inferences also may be drawn from the evidence. Substantial evidence is therefore the controlling standard of review. (Eisenberg et al., Cal. Practice Guide: Civil Appeals and Writs (The Rutter Group 2016) ¶ 8:60, p. 8-29 (Eisenberg, Civil Appeals and Writs) ["Even if the facts were admitted or uncontradicted, the appellate court will not substitute its deductions for the reasonable inferences actually or presumptively drawn by the trial court"]; see *Escobar v. Flores* (2010) 183 Cal.App.4th 737, 752 (*Escobar*); *Milton v. Perceptual Development Corp.* (1997) 53 Cal.App.4th 861, 867 (*Milton*).)

3. Substantial Evidence Supports the Trial Court's Privilege Ruling

Defendants do not dispute the Blaskey e-mail was a privileged attorney-client communication, but contend the trial court erred "as a matter of law" in determining Dick did not waive the privilege. They argue the court "treat[ed] Dick's own post-hoc characterization of his intent as dispositive, while ignoring (or declining to

16

consider) the objective, contemporaneous evidence of Dick's intent." Defendants mischaracterize the trial court's ruling and ignore the substantial evidence supporting the court's conclusion Dick did not waive the privilege.

The trial court concluded Dick did not waive the attorney-client privilege because "[t]here is no basis to find intentional waiver." In support, the court cited Dick's "unequivocal[]" testimony that he did not intend to forward the Blaskey e-mail to Ninetta, and he did not know how it happened. The court also noted the privilege was not waived by Dick's failure to request that Gavin and Pellizzon return the e-mail or to ask Defendants to return copies of the e-mail they produced in discovery. Finally, the court pointed out the "scenario" this case presented did not fit any of the recognized means for waiving the privilege.

Nothing in the trial court's ruling suggests the court failed to consider all the evidence in reaching its decision, and Defendants do not cite anything in the record to support their contrary contention. We presume the trial court knew and properly applied the law absent evidence to the contrary. (*Harris v. Stampolis* (2016) 248 Cal.App.4th 484, 500-501 (*Harris*); *People v. Bush* (2016) 245 Cal.App.4th 992, 1002 (*Bush*).)

Moreover, the trial court was not required to make any findings to support its ruling on the privilege motion. (See *Laabs v. City of Victorville* (2008) 163 Cal.App.4th 1242, 1272 (*Laabs*); *Higdon v. Superior Court* (1991) 227 Cal.App.3d 1667, 1671 (*Higdon*).) We therefore review the court's order by inferring it made all favorable findings that are supported by substantial evidence. (*Clark v. Superior Court* (2011) 196 Cal.App.4th 37, 47 (*Clark*); *Federal Home Loan Mortgage Corp. v. La Conchita Ranch Co.* (1998) 68 Cal.App.4th 856, 860 (*Federal Home Loan*).)

Building on their contention that the trial court failed to consider the objective evidence of Dick's intent to waive the privilege, Defendants assert we may infer factual findings to support the court's ruling only if the record shows the court actually performed its factfinding function. (See *Kemp. Bros. Construction, Inc. v. Titan*

17

*Electric Corp.* (2007) 146 Cal.App.4th 1474, 1477 (*Kemp Bros.*).)  Again, Defendants misconstrue the trial court's order, and therefore their reliance on *Kemp Bros.* is unavailing.

In *Kemp. Bros.*, the plaintiff sought a pretrial writ of attachment, which required the plaintiff to establish the probable validity of its breach of contract claim. The trial court concluded the plaintiff met that burden by showing the defendant was collaterally estopped from relitigating whether it breached the parties' contract, but the court failed to consider whether the plaintiff presented evidence establishing the elements of its claim.  The Court of Appeal reversed, finding collateral estoppel did not apply.  In doing so, the *Kemp Bros.* court declined to consider whether it could infer findings to uphold the trial court's decision because the record expressly showed the trial court never weighed the evidence to determine whether the plaintiff established the probability of its claims.  (*Kemp Bros.*, *supra*, 146 Cal.App.4th at pp. 1476-1478.)  That simply is not the case here.  As explained above, the record does not show the trial court failed to consider and weigh any evidence.  Consequently, we properly may infer findings to support the trial court's decision.

Although Dick's testimony about his intent is not dispositive, it is an important consideration in deciding whether he waived the attorney-client privilege because waiver requires an intention to voluntarily waive a known right.  (*Ardon*, *supra*, 62 Cal.4th at pp. 1188-1189; *Newark*, *supra*, 245 Cal.App.4th at p. 900; *State Fund*, *supra*, 70 Cal.App.4th at p. 653.)  Moreover, substantial evidence besides Dick's testimony supports the trial court's finding Dick did not intentionally waive his attorney-client privilege:  (1) the absence of any text in Dick's e-mail to Ninetta explaining why he forwarded the Blaskey e-mail to her; (2) the forwarded e-mail came from Dick's iPhone; (3) Dick's elderly age (nearly 80 years old); (4) his reduced dexterity caused by multiple sclerosis; (5) the lack of any connection between Ninetta and the MHI dispute discussed in the e-mail; (6) Dick's testimony he rarely spoke with

18

Ninetta and never about MHI; and (7) Gavin's testimony that transmission of the e-mail was a mistake, Dick had no reason to forward the e-mail to Ninetta, and he never spoke with Dick about the e-mail. This constitutes substantial evidence supporting the trial court's conclusion Dick inadvertently forwarded the Blaskey e-mail to Ninetta, and he had no intention of waiving the attorney-client privilege by doing so.

Ninetta's disclosure of the Blaskey e-mail to Gavin, and Gavin's disclosure to Rick, Cox, Pellizzon, and Lurie, cannot support a waiver of the privilege because Ninetta and Gavin are not holders of the privilege. (Evid. Code, § 912, subd. (a); *Pham*, *supra*, 246 Cal.App.4th at p. 668 [only privilege holder may waive privilege].) Substantial evidence supports the finding that Dick did not consent to these disclosures because Dick's initial inadvertent e-mail to Ninetta led to these additional disclosures, and he did not learn about either his e-mail to Ninetta or these further disclosures until a year after they occurred. Indeed, Dick and his counsel did not learn about the disclosure to Lurie until nearly two years after his initial disclosure to Ninetta. Dick simply could not consent to disclosures he knew nothing about.

Defendants ignore the foregoing evidence, and instead argue Dick consented to the disclosures and waived the privilege because Blaskey failed to take precautions to prevent Dick's initial disclosure, Dick intentionally forwarded the e-mail to Gavin to help Gavin mediate the MHI dispute, and both Dick and his various attorneys failed to take prompt and reasonable steps to recover copies of the Blaskey e-mail once the various disclosures were discovered. Defendants point to evidence showing Blaskey failed to prominently mark the e-mail as privileged and confidential when he sent it, when Gavin received the e-mail he was engaged in discussions with Dick, Rick, Cox, Lurie, and Blaskey to mediate the MHI dispute, the timing of Dick's and his counsel's efforts to recover all copies of the e-mail from third parties, Dick's failure to ask Gavin and Pellizzon to return the e-mail, Dick's failure to bring a motion in the Probate Action to declare the Blaskey e-mail privileged and require its return, and the failure of Dick's

19

counsel to suspend Mary Jo's and Teri's depositions in the Malpractice Actions when Fogelman asked them questions about the e-mail.

At most, this creates a conflict in the evidence or supports additional inferences the trial court could have drawn about whether Dick and his counsel intended by their conduct to voluntarily waive the attorney-client privilege. But the governing substantial evidence standard of review requires us to resolve all conflicts and draw all reasonable inferences from the evidence in favor of the trial court's order. (*Leung v. Verdugo Hills Hospital* (2012) 55 Cal.4th 291, 308; *Escobar*, *supra*, 183 Cal.App.4th at p. 752 ["Under the substantial evidence standard of review, 'where two or more different inferences can reasonably be drawn from the evidence, this court is without power to substitute its own inferences for those of the trial court and decide the case accordingly'"].)

For example, although the record shows Gavin attempted to mediate the MHI dispute involving Dick, Rick, and Cox, the evidence also shows Dick forwarded the Blaskey e-mail to Ninetta's e-mail address, not Gavin's. In addition, the evidence showed Gavin did not know why Dick forwarded the e-mail to Ninetta, and Gavin never spoke to Dick about the Blaskey e-mail. Similarly, although Defendants claim Dick and his counsel unreasonably delayed seeking the return of the e-mail, the record shows Dick's counsel in the Probate Action immediately asserted the attorney-client privilege when Rick's lawyer first disclosed the e-mail and demanded that he return all copies. Later in the Probate Action, Dick's counsel again immediately objected and demanded that Fogelman return all copies of the e-mail when he learned during Lurie's deposition that Lurie had received a copy of the Blaskey e-mail. The evidence also showed Pellizzon never kept a copy of the e-mail after he reviewed it and Gavin could not locate the copy in his possession. Significantly, Dick in the Probate Action obtained an agreement that no one would use the contents of the Blaskey e-mail until the parties resolved the waiver dispute, and therefore a motion to declare the e-mail privileged was

20

not necessary because the Probate Action settled before anyone used the Blaskey e-mail.[3] In the malpractice lawsuits, Dick's counsel objected to the e-mail and asked Fogelman to return it when Fogelman asked questions about it at Mary Jo's and Teri's depositions, but did not suspend the depositions because she was not familiar with the document and did not know the circumstances surrounding its disclosure.

Defendants correctly note a court may consider as relevant factors the existence of prominent markings identifying a document as privileged in deciding whether an inadvertent disclosure waived the privilege (*State Fund*, *supra*, 70 Cal.App.4th at p. 653), but the absence of any marking does not require the conclusion the holder waived the privilege (*Rico*, *supra*, 42 Cal.4th at p. 818 [no waiver for inadvertently disclosed document that was not marked as privileged]). Courts must consider the totality of the circumstances, and in doing so repeatedly have found inadvertently disclosed documents that were not marked as privileged retained their privileged status. (*Id*. at pp. 818-819 [document not marked], *Clark*, *supra*, 196 Cal.App.4th at pp. 43, 52 [all inadvertently produced documents were privileged even though only some were marked as privileged].)

Under the substantial evidence standard of review, we may not reverse a trial court's ruling unless the appellant shows the evidence *required* the trial court to reach a different conclusion. (See *Roberts v. El Cajon Motors, Inc.* (2011) 200 Cal.App.4th 832, 841; *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 379.) Defendants failed to satisfy that burden.

---

[3] Defendants contend Rick's identification of the Blaskey e-mail on his trial exhibit list in the Probate Action shows Dick failed to take reasonable steps to recover the e-mail. But listing the e-mail as an exhibit does not disclose its contents and all parties acknowledged the trial court in the Probate Action would have to make a ruling at trial to determine whether the e-mail was privileged before it could be offered as evidence.

B.      *Gibson Dunn's Use of the Blaskey E-mail Violated the* State Fund *Rule*

   1.      Governing Legal Principles on Inadvertently Disclosed Materials

   *State Fund* is the seminal California decision defining a lawyer's ethical obligations upon receiving another party's attorney-client privileged materials.  (*State Fund*, *supra*, 70 Cal.App.4th at pp. 656-657.)  It established the following "standard governing the conduct of California lawyers":  "When a lawyer who receives materials that *obviously appear* to be subject to an attorney-client privilege or otherwise *clearly appear* to be confidential and privileged and where it is *reasonably apparent* that the materials were provided or made available through inadvertence, the lawyer receiving such materials should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged.  The parties may then proceed to resolve the situation by agreement or may resort to the court for guidance with the benefit of protective orders and other judicial intervention as may be justified.  We do, however, hold that whenever a lawyer ascertains that he or she *may have privileged attorney-client material that was inadvertently provided* by another, that lawyer must notify the party entitled to the privilege of that fact."  (*Ibid*., italics added.)

   In *Rico*, the Supreme Court quoted the first two sentences from the foregoing quote as the *State Fund* rule, and extended the rule to materials protected by the attorney work product doctrine because the rule is "a fair and reasonable approach" that "holds attorneys to a reasonable standard of professional conduct when confidential or privileged materials are inadvertently disclosed."  (*Rico*, *supra*, 42 Cal.4th at pp. 817 & 818.)  The *Rico* court also explained the *State Fund* rule establishes "an objective standard" that asks "whether reasonably competent counsel, knowing the circumstances of the litigation, would have concluded the materials were privileged, how much review was reasonably necessary to draw that conclusion, and when counsel's examination should have ended."  (*Rico*, at p. 818.)

22

The *State Fund* rule is "fundamentally based" on the sanctity of the attorney-client privilege and is designed to safeguard the confidential relationship between clients and their attorneys to promote full and open discussion of the facts and tactics surrounding individual legal matters. (*State Fund*, *supra*, 70 Cal.App.4th at p. 657; see *Clark*, *supra*, 196 Cal.App.4th at p. 48.) The rule also is designed to discourage unprofessional conduct (*State Fund*, at p. 657), and it recognizes that "'[a]n attorney has an obligation not only to protect his client's interests but also to respect the legitimate interests of fellow members of the bar, the judiciary, and the administration of justice.'"[4] (*Rico*, *supra*, 42 Cal.4th at p. 818; see *Clark*, at p. 48; *State Fund*, at p. 657.)

The parties point to different portions of the foregoing quote from *State Fund* as the standard for determining when an attorney's *State Fund* duties are triggered. Defendants point to the language stating the duties are triggered when the materials "obviously . . . or . . . clearly appear" to be privileged and it is "reasonably apparent" the materials were inadvertently disclosed. (See *State Fund*, *supra*, 70 Cal.App.4th at p. 656.) Dick points to the language stating the duties are triggered "whenever a lawyer ascertains that he or she *may have* privileged attorney-client material that was inadvertently provided by another." (See *id*. at p. 657, italics added.) The parties do not cite, and we have not found, any authority reconciling the apparent conflict between these two standards for triggering an attorney's *State Fund* duties.

---

[4] To justify its conclusion the *State Fund* rule does not apply here, the dissent acknowledges only the rule's goal of safeguarding the confidential relationship between attorney and client. (Dissent, at p. 3.) The dissent ignores the rule's further purpose of discouraging unprofessional conduct and its recognition of an attorney's ethical obligation to respect the interests of other attorneys, the judiciary, and the administration of justice. *State Fund* and *Rico* both relied on these additional policy considerations in establishing the *State Fund* rule. (*State Fund*, *supra*, 70 Cal.App.4th at p. 657; see *Rico*, *supra*, 42 Cal.4th at p. 818.)

23

The facts of this case do not require us to resolve this conflict because, as explained below, we conclude substantial evidence supports the trial court's implied finding the circumstances surrounding the Blaskey e-mail satisfied the more stringent standard Defendants advocate for triggering Gibson Dunn's *State Fund* duties. Nonetheless, we have three observations concerning the parties' dispute over the proper standard.

First, nearly all the cases applying the *State Fund* rule quote the language on which Defendants rely as the standard for triggering an attorney's *State Fund* duties, while ignoring the language on which Dick relies. The few cases that include the "may have privileged material" language do so while also reciting the "obviously . . . or . . . clearly appear" standard, but do not adopt the language on which Dick relies as the trigger for an attorney's *State Fund* duties. (See, e.g., *Ardon*, *supra*, 62 Cal.4th at p. 1187 [only acknowledging language on which Defendants rely]; *Rico*, *supra*, 42 Cal.4th at p. 817 [same]; *Clark*, *supra*, 196 Cal.App.4th at p. 48 [same]; *Bak v. MCL Financial Group, Inc.* (2009) 170 Cal.App.4th 1118, 1126-1127 [same]; cf. *Pham*, *supra*, 246 Cal.App.4th at pp. 675-676 [acknowledging without specifically applying language on which Dick relies]; *Collins v. State of California* (2004) 121 Cal.App.4th 1112, 1131-1132 [same].) Dick does not cite a single case applying the language on which he relies as the trigger for an attorney's *State Fund* duties.

Second, by using the terms "appear" and "apparent" in the language on which Defendants rely, even with the qualifiers "obviously," "clearly," and "reasonably," the *State Fund* court made clear that the privileged nature of the materials and the inadvertence of their disclosure need not be established to a legal certainty to trigger an attorney's *State Fund* duties.

Finally, a reasonable way to reconcile the issue is to interpret *State Fund* as establishing two standards, with each one applying to slightly different situations. The language Defendants quote applies when an attorney receives materials that obviously or

24

clearly appear to be privileged and it is reasonably apparent the materials were inadvertently disclosed. In that situation, the attorney receiving the materials must refrain from examining them any more than is necessary to determine their privileged nature, immediately notify the privilege holder the attorney has received materials that appear to be privileged, attempt to reach an agreement with the privilege holder about the materials' privileged nature and their appropriate use, and resort to the court for guidance if an agreement cannot be reached. The attorney must not further review or use the materials for any purpose while the issue remains in dispute.

The language Dick quotes applies when an attorney ascertains that he or she received materials that are not obviously or clearly privileged, but nonetheless may be privileged materials that were inadvertently disclosed. This plainly is a lower standard, and it triggers a more limited response. In this situation, the attorney's duty is simply to notify the privilege holder that the attorney may have privileged documents that were inadvertently disclosed. At that point, the onus shifts to the privilege holder to take appropriate steps to protect the materials if the holder believes the materials are privileged and were inadvertently disclosed.

Regardless of how the *State Fund* rule is stated, Defendants and our dissenting colleague seek to limit it to privileged materials an attorney receives through *the inadvertence of opposing counsel during litigation*. Although the *State Fund* rule originated in the context of one attorney inadvertently producing his client's privileged documents to the opponent's attorney during litigation, neither the statement of the rule nor the policy underlying it supports limiting the scope of the rule to that one circumstance. Moreover, subsequent case law applying the rule has not limited it to that circumstance.

In *Clark*, for example, the Court of Appeal applied the *State Fund* rule to an attorney who received an opponent's privileged documents from his own client rather than the opposing party or its attorney. There, the plaintiff stole some of his employer's

25

privileged documents when the employer fired him, and then provided the documents to his attorney for use in the plaintiff's lawsuit against the employer. (*Clark*, *supra*, 196 Cal.App.4th at pp. 42-44.) The *Clark* court concluded the *State Fund* rule applied because the documents were privileged and the employer did not intend to disclose them. The attorney's receipt of the documents from his own client before the litigation began did not factor into the court's analysis, nor did the court rely on the client's theft of the documents in determining whether the *State Fund* rule applied. (*Clark*, at pp. 52-54.) Adopting Defendants' limitation would perversely permit the use of stolen, privileged materials, but not those inadvertently disclosed.[5]

In *Rico*, the Supreme Court applied the *State Fund* rule to attorney work product notes that a plaintiff's attorney acquired during litigation, but were not produced either by the defense attorney who created the notes or by the defendant he represented. The plaintiff's attorney argued a court reporter mistakenly gave him the notes during a deposition, but defense counsel argued the plaintiff's attorney stole the notes from his file during the same deposition. (*Rico*, *supra*, 42 Cal.4th at pp. 811-812.) The Supreme Court concluded the *State Fund* rule applied by simply examining whether the notes were clearly privileged and whether it was reasonably apparent their disclosure was inadvertent. Whether the plaintiff's attorney wrongfully took the notes, or the court

---

[5]     The dissent states, "The *Clark* court merely assumed the *State Fund* rule applied and analyzed whether it was violated." (Dissent, at p. 4.) Not so. In *Clark*, it was undisputed the client stole the privileged communications from his employer and turned them over to his attorney, and therefore no issue existed as to the inadvertence of the disclosure. (*Clark*, *supra*, 196 Cal.App.4th at pp. 43-44, 52.) The *Clark* court therefore examined the evidence concerning the communications to determine whether they were privileged and the extent to which a reasonably competent attorney would need to review the communications to determine their privileged nature. The court also considered evidence regarding the extent of the attorney's review of the communications to determine whether it exceeded what was reasonably necessary to determine whether the communications were privileged. (*Clark*, at pp. 51-54.) Contrary to the dissent's suggestion, that is an analysis of whether the *State Fund* rule applied, not an assumption.

26

reporter mistakenly gave them to the plaintiff's attorney, did not influence the court's analysis because the record showed the defendant's attorney did not intend to disclose the notes, and therefore the disclosure was inadvertent under either scenario.[6] (*Rico*, at pp. 818-819.)

   2.   Substantial Evidence Supports the Trial Court's Application of the *State Fund* Rule

Defendants challenge the sufficiency of the evidence to support the trial court's conclusion Gibson Dunn violated its *State Fund* obligations, arguing the record lacks evidence showing the Blaskey e-mail obviously appeared to be privileged, it was reasonably apparent the e-mail was inadvertently disclosed, or Gibson Dunn failed to comply with its *State Fund* duties to the extent they were triggered. We disagree.

As with the privilege motion, the trial court was not required to make any express findings to support its ruling on the disqualification motion, and we are required to infer the court made all findings necessary to support its conclusion. (*Clark*, *supra*, 196 Cal.App.4th at pp. 46-47; *Laabs*, *supra*, 163 Cal.App.4th at p. 1272; *Federal Home Loan*, *supra*, 68 Cal.App.4th at p. 860; *Higdon*, *supra*, 227 Cal.App.3d at p. 1671.) As *Clark* explained, "'where there are no express findings, we must review the trial court's [decision] based on implied findings that are supported by substantial evidence.'" (*Clark*, at pp. 46-47.) We also presume the court knew and properly applied the law absent evidence to the contrary. (*Harris*, *supra*, 248 Cal.App.4th at pp. 500-501; *Bush*, *supra*, 245 Cal.App.4th at p. 1002.) The substantial evidence standard therefore governs our review of the trial court's implied findings that Gibson Dunn's *State Fund* obligations

----

   [6]   *Rico* debunks the dissent's suggestion that *Clark* is distinguishable from this case because the client in *Clark* wrongfully obtained the privileged documents he turned over to his attorney, but "[t]here was nothing wrongful about Lurie's acquisition or possession of the Blaskey e-mail." (Dissent, at p. 4.) Neither *Rico* nor *Clark* require a wrongful acquisition for the *State Fund* rule to apply to documents an attorney received from his or her client.

27

were triggered and it violated those obligations through its use of the Blaskey e-mail.[7]
(*Clark*, at pp. 46-47, 52-54.)

Here, the evidence shows that when Gibson Dunn in June 2015 discovered the Blaskey e-mail in its client's files, it knew Blaskey was Dick's personal attorney representing Dick in his dispute with Rick and Cox over control of MHI, and Lurie potentially was an adverse party to Dick based on Lurie's actions regarding the Hausman family trusts and MHI. A cursory review of the e-mail showed it was from Blaskey to Dick, with copies to Blaskey's law partner, Kessel, and Dick's personal assistant and advisor, Lindsay. The e-mail summarized a meeting among the parties to the dispute and their attorneys. This constitutes substantial evidence supporting the conclusion the Blaskey e-mail was a communication made in the course of an attorney-client

---

[7] Citing *Kemp Bros.*, the dissent concludes we "cannot" imply any findings to support the trial court's decision because "[t]he record demonstrates the trial court never weighed the evidence and performed the fact finding function regarding Gibson Dunn's asserted *State Fund* obligations." (Dissent, at p. 6.) Not true. As explained above, *Kemp Bros.* observed an appellate court should not imply findings to support a trial court ruling only when the record expressly shows the trial court never performed its factfinding function concerning the issue on which the appellate court would otherwise imply findings. (*Kemp Bros.*, *supra*, 146 Cal.App.4th at pp. 1476-1478.) Here, the record shows the trial court received evidence from the parties and decided Dick's motion based on that evidence. Neither Defendants nor the dissent cites anything in the record to show the trial court expressly refused to perform its fact finding function on a particular issue.

The dissent also asserts we should determine the *State Fund* rule does not apply in this case as a matter of law because the decisive facts are undisputed and the rule's application therefore presents a question of law. (Dissent, at p. 5.) We disagree. The dissent conveniently ignores many of the disputed facts we have described in this opinion relating to the disclosure of the Blaskey e-mail and whether the *State Fund* rule applies. Moreover, even if we assume the central facts were not in dispute, the trial court nevertheless had to resolve the competing inferences presented by those facts. Of course, the prevailing standard of review requires us to presume the court made the necessary inferences required to support its decision. (Eisenberg, Civil Appeals and Writs, *supra*, ¶ 8:60, p. 8-29; see *Escobar*, *supra*, 183 Cal.App.4th at p. 752; *Milton*, *supra*, 53 Cal.App.4th at p. 867.)

28

relationship, and therefore it was presumptively privileged. (Evid. Code, § 917, subd. (a); *Costco*, *supra*, 47 Cal.4th at p. 733; *Pham*, *supra*, 246 Cal.App.4th at p. 665.) Under these circumstances, the Blaskey e-mail was a presumptively privileged document and therefore was an "obviously privileged" document under the *State Fund* rule. (*Clark*, *supra*, 196 Cal.App.4th at p. 53 ["Under *Costco*, once the examination showed a document had been transmitted between an attorney representing [the defendant] and either an officer or employee of [the defendant], that examination would suffice to ascertain the materials are privileged, and any further examination would exceed permissible limits"].)

This conclusion is further supported by evidence showing Rick's attorney in the Probate Action concluded the *State Fund* rule applied when he found a copy of the Blaskey e-mail in his client's documents. Specifically, after reviewing the e-mail, Rick's counsel pulled the e-mail from his client's document production, sent it to Dick's counsel under separate cover, and asked whether Dick claimed the e-mail was privileged because the original e-mail appeared to be a confidential communication between Dick and his personal attorney.

Defendants contend the Blaskey e-mail was not obviously privileged because Lindsay was an original recipient of the e-mail and Gibson Dunn only knew Lindsay as MHI's bookkeeper. According to Defendants, Lindsay was an unnecessary party to the communication and therefore her inclusion prevented the privilege from attaching. (See Evid. Code, § 952 [defining "'confidential communication between client and lawyer'"].) Defendants cite no evidence they did not know Lindsay also was Dick's personal assistant and advisor when Gibson Dunn discovered the e-mail, produced it in the Probate Action, and defended Lurie's August 13, 2015 deposition. (See *Zurich American Ins. Co. v. Superior Court* (2007) 155 Cal.App.4th 1485, 1501 [disclosure to client's secretary, assistant, advisor, or other representative does not prevent attorney-client privilege from attaching].) Nonetheless, any question about Lindsay's

29

position as Dick's personal assistant and advisor was removed on August 19, 2015, when Gibson Dunn deposed her and she testified she also worked for Dick personally. That was several days *before* Gibson Dunn deposed Mary Jo and Teri about the e-mail.

Defendants also contend the Blaskey e-mail was not obviously privileged because Gibson Dunn reasonably concluded Dick had waived the privilege by forwarding it to Ninetta and then allowing her to forward it to Gavin, who then provided it to Rick, Cox, Pellizzon, and Lurie. But the circumstances here did not permit Gibson Dunn to decide on its own whether the privilege was waived. As explained above, the original e-mail from Blaskey to Dick was presumptively privileged as a confidential communication between attorney and client during the course of the representation. Those facts triggered Gibson Dunn's *State Fund* obligations. (*Clark*, *supra*, 196 Cal.App.4th at p. 53.) Contrary to Defendants' suggestion, an attorney's *State Fund* duties are not limited to situations where the materials are indisputably privileged, leaving no basis to infer the privilege has been waived or an exception applies.

For example, Formal Opinion No. 2013-188 of the California State Bar Standing Committee on Professional Responsibility and Conduct (State Bar, Formal Opinion No. 2013-188) concludes an attorney's *State Fund* duties are triggered when the attorney receives a communication that is presumptively privileged as a confidential communication between another attorney and his or her client, even if "the [receiving] attorney reasonably believes that the communication may not be privileged because of the crime-fraud exception to the attorney-client privilege." (State Bar, Formal Opinion No. 2013-188, at p. 1; see *Coldren v. Hart, King & Coldren, Inc.* (2015) 239 Cal.App.4th 237, 250, fn. 8 [although not binding on courts, formal opinions from California State Bar may be persuasive authority].) That opinion presents the hypothetical of an attorney who sues a company for fraud and receives an anonymous e-mail and attachment from a former company employee. The e-mail explains the attachment is a confidential communication between the company and its attorney that proves the company planned

30

and perpetrated the alleged fraud with the advice and assistance of its counsel. (*Ibid*.) The formal opinion explains the potential application of the crime-fraud exception "does not vitiate [the a]ttorney's duties under *State Fund* and *Rico*" (State Bar, Formal Opinion No. 2013-188, at p. 4), and the attorney may not ethically read the attachment to the e-mail. Instead, the attorney must notify opposing counsel, refrain from further reviewing the communication, and otherwise proceed as described in *State Fund*. (State Bar, Formal Opinion No. 2013-188, at pp. 5-6.)

That is a logical application of the *State Fund* rule. Allowing opposing counsel to avoid their *State Fund* obligations any time they can fashion a colorable argument for overcoming the privilege would create an exception that would swallow the *State Fund* rule. As *State Fund* and the other cases explain, an attorney's obligation is to review the materials no more than necessary to determine whether they are privileged, and then notify the privilege holder's counsel. At that point, the parties may confer about whether the material is privileged and whether there has been a waiver. If the parties are unable to reach an agreement either side may seek guidance from the trial court. (*Rico*, *supra*, 42 Cal.4th at p. 817; *Clark*, *supra*, 196 Cal.App.4th at p. 48; *State Fund*, *supra*, 70 Cal.App.4th at pp. 656-657.) The attorney receiving the material, however, is not permitted to act as judge and unilaterally make that determination.

Defendants complain this application of the *State Fund* rule will allow the privilege holder and its counsel to unduly delay a lawsuit and engage in other forms of gamesmanship that prejudice the party whose counsel received the materials. But the materials at issue must obviously or clearly appear privileged, and the recipient of apparently privileged materials may expedite resolution of any dispute by bringing its own motion seeking the court's guidance. The trial court then may impose sanctions and issue other appropriate orders to address the privilege holder's alleged abuse of the *State Fund* rule. The important policy considerations underlying the attorney-client privilege and the *State Fund* rule, however, do not allow the recipient of inadvertently disclosed

31

documents to unilaterally determine the privilege has been waived and then proceed to use the documents. In doing so, the recipient risks that the trial court will draw a different conclusion, which would expose the recipient to adverse consequences for violating the *State Fund* rule, including disqualification as attorney of record. In close cases, prudence requires following the *State Fund* procedures.

Next, Defendants argue Gibson Dunn's *State Fund* duties were not triggered because many of the same facts that purportedly showed the Blaskey e-mail was not obviously privileged also showed it was not reasonably apparent the e-mail had been disclosed inadvertently. Specifically, Defendants point to evidence showing Gibson Dunn found the e-mail in its clients' own electronic documents while preparing Defendants' response to a subpoena in the Probate Action, Lurie received the e-mail because Gavin forwarded it to him well before any litigation commenced, Gavin then was acting as an intermediary seeking to resolve the dispute over MHI, and Gavin had a copy of the e-mail because Dick forwarded it to Ninetta, who forwarded it to Gavin. None of this overcomes the substantial evidence supporting the trial court's ruling for the same reasons already discussed.

Gibson Dunn's discovery of the e-mail in its clients' own files and Lurie's receipt of the e-mail from Gavin when he mediated the MHI dispute does not render Dick's disclosure of the e-mail any less inadvertent. On its face, the original e-mail still was a presumptively privileged communication between attorney and client discussing the MHI dispute. Dick's transmission of the e-mail to Ninetta, which eventually reached Lurie, suggests the possibility Dick may have waived the attorney-client privilege, but the *State Fund* rule does not allow Gibson Dunn to assume that he did. Dick's e-mail transmission sheds no light on why he shared this presumptively privileged e-mail with Ninetta, and therefore provides no assurances he intended to waive the privilege.[8] As

---

[8] The dissent accuses us of "improperly equating the presumption of privilege (Evid. Code, § 917, subd. (a)), with a presumption of inadvertence." (Dissent,

32

explained above, the *State Fund* rule establishes an objective standard and substantial evidence supports the conclusion it was reasonably apparent the Blaskey e-mail was inadvertently disclosed. Indeed, the same basic facts led Rick's Probate Action counsel to determine the *State Fund* rule applied and required him to notify Dick's counsel and not use the e-mail.[9]

at p. 8.) Not so. The presumption of privilege arises from the facts surrounding the original transmission of the e-mail from Blaskey to Dick during their attorney-client relationship (Evid. Code, § 917, subd. (a); *Costco*, *supra*, 47 Cal.4th at p. 733; *Pham*, *supra*, 246 Cal.App.4th at p. 665), and that presumption supports the trial court's determination the e-mail was obviously privileged under the *State Fund* rule (*Clark*, *supra*, 196 Cal.App.4th at p. 53). Our inadvertent disclosure analysis, however, focuses on the facts surrounding Dick's later disclosure of the Blaskey e-mail to Ninetta, her disclosure to Gavin, and Gavin's disclosure to Rick, Cox, Pellizzon, and Lurie. We are at a loss to see how we equated the presumption of privilege with a presumption of inadvertence.

[9]     Citing *Great American Assurance Co. v. Liberty Surplus Ins. Corp.* (N.D. Cal. 2009) 669 F.Supp.2d 1084, the dissent concludes it was not reasonably apparent that Dick inadvertently disclosed the Blaskey e-mail. (Dissent, at p. 4.) *Great American* does not support the dissent's conclusion. There, the federal district court concluded the *State Fund* rule did not apply based on that court's factual determinations that the privilege holder waived the attorney-client privilege by sharing an insurance coverage opinion with an outside insurance broker, and the facts surrounding the communications among the parties did not establish inadvertent disclosure. (*Great American*, at pp. 1091-1092, 1093-1094.) The dissent fails to understand that we, as an appellate court, are not free to make those factual determinations. Rather, we are limited to deciding whether substantial evidence supports the trial court's express and implied factual determinations. Here, the trial court determined Dick did not waive the attorney-client privilege and the disclosure was inadvertent. We may overturn those determinations only if the record lacks substantial evidence to support them, even if the evidence also would support a different conclusion. (*Clark*, *supra*, 196 Cal.App.4th at pp. 46-47.) As explained above, substantial evidence supports the trial court's determinations, and therefore we must uphold the trial court's decision. The district court's initial factual findings in *Great American* provide no guidance for applying the standard of review on appeal. This procedural difference may explain why no California appellate court has cited *Great American*.

Taking the issue a step further, the dissent also concludes the record lacks substantial evidence to support the trial court's implied finding it was reasonably

Moreover, even if the face of the Blaskey e-mail and the circumstances surrounding its disclosure were not sufficient to put Gibson Dunn on notice it likely received an inadvertently disclosed, privileged document, the objections of Dick's counsel at Lurie's deposition in the Probate Action removed any doubt. (*Clark*, *supra*, 196 Cal.App.4th at pp. 52-53 [counsel's warning on privilege holder's behalf triggers an opposing attorney's *State Fund* duties].) At that deposition, Rick's counsel asked Lurie questions based on a copy of the Blaskey e-mail that Defendants produced in response to the subpoena served on them in the Probate Action. Dick's counsel immediately objected, asserting the Blaskey e-mail was privileged and that it had been disclosed inadvertently. He not only demanded that Rick's counsel return all copies under their earlier agreement to preserve Dick's privilege claim concerning the e-mail, but he also demanded that Gibson Dunn return all its copies. Although Fogelman asserted the e-mail was not privileged and that Gibson Dunn was not obligated to return it, the objections by Dick's attorney constitute substantial evidence that Gibson Dunn reasonably should have

apparent the Blaskey e-mail was inadvertently disclosed. (Dissent, at pp. 7-8.) Although the dissent acknowledges the governing substantial evidence standard of review, it fails to properly apply it. Under that standard, "The trial court's order is '"presumed correct; all intendments and presumptions are indulged to support [it]; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive."' [Citations.] Hence, we presume the trial court found in [Dick's] favor on 'all disputed factual issues.' . . . 'In viewing the evidence, we look only to the evidence supporting the prevailing party. [Citation.] We discard evidence unfavorable to the prevailing party as not having sufficient verity to be accepted by the trier of fact. [Citation.] Where the trial court has drawn reasonable inferences from the evidence, we have no power to draw different inferences, even though different inferences may also be reasonable.' [Citation.] 'If the trial court resolved disputed factual issues, the reviewing court should not substitute its judgment for the trial court's express or implied findings supported by substantial evidence.'" (*Clark*, *supra*, 196 Cal.App.4th at pp. 46-47.) The dissent, however, does precisely what appellate courts may not do. It looks only to the evidence favorable to the *non*prevailing party while ignoring the evidence supporting the trial court's implied findings.

34

realized the Blaskey e-mail was an inadvertently disclosed, privileged document subject to the *State Fund* rule.[10]

To support their contention any inadvertence in Dick's disclosure was not readily apparent, Defendants also point to a letter Dick's Malpractice Actions counsel wrote in November 2015. Dick's attorney stated she wanted to conduct additional discovery of the facts underlying the privilege dispute before bringing a motion to resolve the issue. According to Defendants, if Dick's counsel wanted to conduct discovery on this issue in November 2015, then it could not have been apparent to Gibson Dunn in August 2015 that Dick's disclosure was inadvertent. Defendants misconstrue this letter and the governing standards.

Dick's attorney consistently maintained that Dick's disclosure of the Blaskey e-mail was inadvertent and *State Fund* required Gibson Dunn to return the e-mail. Dick's counsel made clear in this letter she wanted to conduct discovery on Defendants' waiver theory. Specifically, she sought to depose everyone who received a

---

[10] Citing *State Fund*, the dissent concludes the objections of Dick's counsel are irrelevant because "Gibson Dunn's *State Fund* obligations were triggered, if at all, at the time Gibson Dunn found it had *received* the privileged document." (Dissent, at p. 8.) *State Fund*, however, imposes no such limitation and the dissent provides no explanation to support its contrary conclusion. As explained above, *Clark* relied on warnings and objections from opposing counsel in concluding an attorney's *State Fund* duties were triggered. (*Clark*, *supra*, 196 Cal.App.4th at pp. 52-53.) That is a logical application because the *State Fund* rule establishes an objective standard that examines whether a reasonably competent attorney, *knowing the facts of the case*, would determine a document was clearly privileged and it was reasonably apparent its disclosure was inadvertent. (*Rico*, *supra*, 42 Cal.4th at p. 818.) Objections or warnings by the privilege holder's lawyer may provide the missing information necessary to enable an opposing attorney to determine the *State Fund* rule applies. No policy or other reason justifies the dissent's limitation on the *State Fund* rule. Obviously, an attorney cannot violate the *State Fund* rule until he or she possesses sufficient information to allow a reasonable competent attorney to determine the rule has been triggered, but once an attorney has sufficient information, the rule applies and further review or use the privileged material is prohibited.

copy of the e-mail to establish Dick did not intentionally disclose the e-mail to them. As explained above, the *State Fund* rule applies whenever a reasonably competent attorney would conclude the materials are obviously or clearly privileged and it is reasonably apparent they were inadvertently disclosed. The rule applies to prevent further disclosures while the parties resolve the dispute over whether the document remains privileged. Conducting discovery to address Gibson Dunn's claim the document was not privileged is consistent with the *State Fund* rule.

Finally, Defendants contend Gibson Dunn ceased using the Blaskey e-mail when it received the September 4, 2015 letter from Dick's counsel providing a detailed explanation to support Dick's claim the e-mail was privileged and that he had not waived the privilege. Before receiving that letter, Defendants contend Gibson Dunn did not have sufficient information to determine the *State Fund* rule applied. Not so.

As explained above, the Blaskey e-mail on its face and the circumstances surrounding its disclosure supports the trial court's finding Gibson Dunn should have realized the *State Fund* rule applied when it originally produced the e-mail in July 2015. At a minimum, the record supports the conclusion Gibson Dunn should have realized the *State Fund* rule applied after Lurie's August 13, 2015 deposition when Dick's Probate Action attorney objected that the e-mail was an inadvertently disclosed, privileged document and demanded Fogelman and Gibson Dunn return all their copies. At that point, the *State Fund* rule required Gibson Dunn to stop using the Blaskey e-mail and either return it to Dick or schedule further discussions with his lawyers to evaluate the status of the e-mail. Defendants' contentions that Dick may have waived the privilege did not prevent the *State Fund* rule from applying before September 4. Rather, these contentions merely raised an issue for the parties to resolve in their discussions. Gibson Dunn, however, violated its *State Fund* duties by using the Blaskey e-mail and reading substantial portions of it into the record at Mary Jo's and Teri's depositions on August 24 and 25, quoting the e-mail in interrogatory responses it served on August 24, producing a

36

copy of the e-mail in responding to a discovery request on September 14, and submitting a copy to the court in opposition to the privilege motion in February 2016.[11]

Defendants contend Gibson Dunn did not violate its *State Fund* duties by questioning Mary Jo and Teri about the Blaskey e-mail because Dick's lawyer in the Malpractice Actions allowed Fogelman to ask questions about the e-mail subject to a later motion to strike. But the evidence showed that Dick's counsel in the Malpractice Actions objected to Fogelman using the e-mail at these depositions. She explained she was not familiar with the e-mail and needed to learn more about it and how Defendants obtained it, but as she read the lengthy e-mail during the depositions she objected it was an attorney-client privileged communication, it appeared to have been inadvertently disclosed, and she demanded Fogelman return it to Dick. Fogelman disputed the e-mail was privileged and refused to return it, but he failed to tell Dick's attorney that Dick's other lawyer in the Probate Action had objected to the e-mail at Lurie's deposition a few days earlier, had demanded Fogelman return it, and had reached an agreement with all parties to the Probate Action to preserve the privilege until they resolved the waiver

---

[11] Assuming the *State Fund* rule applied, the dissent concludes Gibson Dunn discharged its *State Fund* duties by producing the Blaskey e-mail in July 2015, as part of Defendants' response to the subpoena Dick served in the Probate Action. According to the dissent, the *State Fund* rule simply required Gibson Dunn to "notify" Dick's attorneys they had a copy of the Blaskey e-mail and the production did so. (Dissent, at p. 9.) We disagree. Including the e-mail as part of a larger document production does not notify the privilege holder that the producing party possesses a communication that appears to be privileged. (*State Fund*, *supra*, 70 Cal.App.4th at p. 656.) "Notify" means to inform someone of something or bring to their attention. (See <http://www.dictionary.com/browse/notify> [as of March 23, 2017.) More importantly, an attorney's *State Fund* duties are not limited to merely notifying the privilege holder that the attorney possesses a communication that appears to be privileged. The attorney also must refrain from examining the communication any more than necessary to determine its privileged nature, and the attorney may not use the communication to prosecute or defend the action. (*Clark*, *supra*, 196 Cal.App.4th at pp. 53-54.) As explained above, Gibson Dunn continued to review the Blaskey e-mail after producing it, formulated and asked deposition questions based on it, and read portions of it into the record at two depositions.

dispute. The trial court reasonably could conclude Fogelman attempted to exploit Dick's representation by separate counsel in the Probate Action and Malpractice Actions. This constitutes substantial evidence supporting the conclusion Gibson Dunn violated its ethical obligations under the *State Fund* rule. (See *Rico*, *supra*, 42 Cal.4th at pp. 815, fn. 8 & 819 [attorney receiving opponent's attorney work product disqualified for violating *State Fund* duties, and work product protection was not waived by failing to assert it during deposition when attorney defending deposition lacked sufficient information to know opponent was using his cocounsel's work product].)

Moreover, Defendants' contention ignores the affirmative nature of the duties imposed by the *State Fund* rule when an attorney receives materials that are likely privileged and were likely disclosed inadvertently. An attorney's *State Fund* obligations are not contingent on the privilege holder asserting an objection or otherwise convincing the attorney who received the materials that they are privileged and were disclosed inadvertently. Rather, the obligations are immediately triggered when a review of the materials would lead a reasonably competent attorney to conclude the materials are clearly or obviously privileged and it is reasonably apparent they were disclosed inadvertently.

We do not suggest the privilege holder is excused from taking reasonable steps to preserve the privilege and recover inadvertently disclosed materials. A privilege holder may waive the privilege, and render the *State Fund* rule inapplicable, by failing to take reasonable steps necessary to preserve the privilege. (See Evid. Code, § 912, subd. (a).) As explained above, however, substantial evidence supports the trial court's implied findings that Dick did not waive the attorney-client privilege because he and his attorneys acted reasonably to preserve the attorney-client privilege during the short time period that elapsed between their discovery at Lurie's deposition that Gibson Dunn had a

38

copy of the Blaskey e-mail, and Gibson Dunn's use of the e-mail two weeks later at Mary Jo's and Teri's depositions.[12]

---

[12]     The dissent prompts more head scratching when it concludes the *State Fund* rule does not apply because Dick's attorneys failed to take reasonable steps to preserve the attorney-client privilege after learning the Blaskey e-mail had been disclosed. (Dissent, at p. 2.)  First, the dissent asserts Dick's attorneys should have done more after Rick's attorney in the Probate Action alerted them that Dick had sent the Blaskey e-mail to Ninetta, including conducting an investigation to determine whether the disclosure went beyond Ninetta, Gavin, Rick, Cox, and Pellizzon. (*Ibid*.)  The record, however, fails to show that anyone knew the disclosure went beyond those individuals. Dick's attorneys immediately obtained an agreement from the attorney for Rick and Cox that he would collect and destroy all copies of the e-mail they had except one, which they kept to litigate the dispute over whether the e-mail remained privileged.  Although Pellizzon testified he saw a copy of the e-mail, he also testified he never kept one. Similarly, Gavin testified he could not find a copy of the e-mail.  As for Gavin forwarding the e-mail to Lurie, he testified he did not recall doing so.  This is substantial evidence supporting the trial court's implied finding Dick's attorneys acted reasonably because the disclosure went no further than these individuals and all available copies were recovered.

    The dissent also faults Dick's attorneys for failing to take action to preserve the privilege after Gibson Dunn's production of the e-mail in the Probate Action. (Dissent, at p. 2.)  The record supports the trial court's implied finding Dick's attorneys acted appropriately.  Gibson Dunn produced the e-mail as part of a "several thousand page document production . . . on or about July 31, 2015."  Dick's attorneys first learned that Gibson Dunn had a copy of the e-mail when Rick's attorney questioned Lurie about it at his deposition on August 13, 2015.  Dick's attorneys immediately objected to the questions about the e-mail, asserted it was an inadvertently produced, privileged document, and demanded Gibson Dunn return all copies.  The dissent apparently faults Dick's attorneys for not finding the e-mail in the document production during the two weeks that elapsed between the production and Lurie's deposition.  Based on the size of the production, we agree with the trial court's implied finding that Dick's attorneys acted reasonably.

C.     *Disqualification Was an Appropriate Remedy*

1.     Governing Legal Principles on Attorney Disqualification

"A disqualification motion involves a conflict between a client's right to counsel of his or her choice, on the one hand, and the need to maintain ethical standards of professional responsibility, on the other. [Citation.] Although disqualification necessarily impinges on a litigant's right to counsel of his or her choice, the decision on a disqualification motion 'involves more than just the interests of the parties.' [Citation.] When ruling on a disqualification motion, '[t]he paramount concern must be to preserve public trust in the scrupulous administration of justice and the integrity of the bar. The important right to counsel of one's choice must yield to ethical considerations that affect the fundamental principles of our judicial process.'" (*Clark*, *supra*, 196 Cal.App.4th at pp. 47-48; see *People ex rel. Dept. of Corporations v. SpeeDee Oil Change Systems, Inc.* (1999) 20 Cal.4th 1135, 1145 (*SpeeDee Oil*).) Protecting the confidentiality of communications between attorney and client is a fundamental principle of our judicial process and an opposing attorney who breaches that principle may be disqualified from further participation in the litigation. (*SpeeDee Oil*, at p. 1146; *Clark*, at p. 48.)

In the context of inadvertently disclosed, attorney-client communications, "'"'[m]ere exposure'"' to an adversary's confidences is insufficient, standing alone, to warrant an attorney's disqualification.'" (*Clark*, *supra*, 196 Cal.App.4th at p. 54; see *Rico*, *supra*, 42 Cal.4th at p. 819.) "'Protecting the integrity of judicial proceedings does not require so draconian a rule [because it] would nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in an attorney's mailbox.'" (*State Fund*, *supra*, 70 Cal.App.4th at p. 657; see *Rico*, at p. 819.) Nonetheless, "'"in an appropriate case, disqualification might be justified if an attorney inadvertently receives confidential materials and fails to conduct himself or herself in [accordance with his or her *State Fund* duties], assuming other

40

factors compel disqualification.""'" (*Clark*, at p. 54; see *Rico*, at p. 819; *State Fund*, at p. 657.)

"[D]isqualification is proper as a prophylactic measure to prevent future prejudice to the opposing party from information the attorney should not have possessed"; an affirmative showing of existing injury from the misuse of privileged information is not required. (*Clark*, *supra*, 196 Cal.App.4th at p. 55.) A trial court, however, may not order disqualification "'simply to punish a dereliction that will likely have no substantial continuing effect on future judicial proceedings.'" (*Oaks Management Corporation v. Superior Court* (2006) 145 Cal.App.4th 453, 467 (*Oaks Management*), quoting *Gregori v. Bank of America* (1989) 207 Cal.App.3d 291, 309 (*Gregori*), italics omitted.)

"[T]he significant question is whether there exists a genuine likelihood that the status or misconduct of the attorney in question will affect the outcome of the proceedings before the court. Thus, disqualification is proper where, as a result of a prior representation or through improper means, there is a reasonable probability counsel has obtained information the court believes would likely be used advantageously against an adverse party during the course of the litigation. Though such information cannot be unlearned, and the lawyer who obtained it cannot be prevented from giving it to others, disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage." (*Gregori*, *supra*, 207 Cal.App.3d at p. 309; see *Oaks Management*, *supra*, 145 Cal.App.4th at p. 467.)

"A trial court's ruling on a disqualification motion is reviewed under the deferential abuse of discretion standard. [Citations.] 'In exercising its discretion, the trial court must make a reasoned judgment that complies with applicable legal principles and policies.' [Citations.] 'The order is subject to reversal only when there is no reasonable basis for the trial court's decision.'" (*Clark*, *supra*, 196 Cal.App.4th at p. 46.)

41

"Even under [the abuse of discretion] standard, there is still a substantial evidence component. We defer to the trial court's factual findings so long as they are supported by substantial evidence, and determine whether, under those facts, the court abused its discretion." (*Tire Distributors, Inc. v. Cobrae* (2005) 132 Cal.App.4th 538, 544; see *Clark*, *supra*, 196 Cal.App.4th at p. 46.) "The trial court's order is '"presumed correct; all intendments and presumptions are indulged to support [it]; conflicts in the declarations must be resolved in favor of the prevailing party, and the trial court's resolution of any factual disputes arising from the evidence is conclusive."'" (*Clark*, at pp. 46-47.)

2. The Trial Court Did Not Abuse Its Discretion in Disqualifying Gibson Dunn

Defendants contend the trial court erred in disqualifying Gibson Dunn because the court based its ruling "solely upon Gibson Dunn's *prior* 'use and review'" of the Blaskey e-mail without considering whether past use of that information would have a substantial and continuing effect on future proceedings in the Malpractice Actions. According to Defendants, the court applied an improper legal standard by concluding Gibson Dunn's disqualification followed automatically from the court's finding Gibson Dunn violated its *State Fund* obligations. We disagree and find no abuse of discretion.

In its minute order, the trial court explained it disqualified Gibson Dunn because "[c]ounsel's review and use of the e[-]mail at deposition goes beyond 'mere exposure' and raises the likelihood that this could affect the outcome of these proceedings both in terms of [Dick's] rights against use of his privileged communications against him and in terms of the integrity of these judicial proceedings and public confidence in them."

The trial court's explanation demonstrates it understood it could not base disqualification solely on Gibson Dunn's violation of its *State Fund* duties, but also must determine whether there was a likelihood the violation would impact the outcome of the

42

Malpractice Actions and the public's trust in both the scrupulous administration of justice and the integrity of the bar.  (*Clark*, *supra*, 196 Cal.App.4th at pp. 54-55 & fn. 9; see *Oaks Management*, *supra*, 145 Cal.App.4th at p. 467.)  Nothing in the court's ruling supports Defendants' contention the court disqualified Gibson Dunn solely because it violated its *State Fund* duties by reviewing and using the Blaskey e-mail.  Absent evidence to the contrary, we presume the trial court knew and properly applied the law.  (*Harris*, *supra*, 248 Cal.App.4th at pp. 500-501; *Bush*, *supra*, 245 Cal.App.4th at p. 1002.)

Defendants also fault the trial court for failing to make specific findings explaining how Gibson Dunn's violation of its *State Fund* duties would impact the outcome in the Malpractice Actions.  The law, however, does not require the trial court to make any findings to support or explain its ruling, and Defendants did not request any.  (*Laabs*, *supra*, 163 Cal.App.4th at p. 1272; *Higdon*, *supra*, 227 Cal.App.3d at p. 1671.)  We therefore review the trial court's ruling by inferring it made all findings favorable to its decision that are supported by substantial evidence.  (*Clark*, *supra*, 196 Cal.App.4th at p. 47.)

The record shows Gibson Dunn received the Blaskey e-mail from its client and fully reviewed the communication before producing it in response to Dick's subpoena in the Probate Action.  At Lurie's deposition in the Probate Action, Rick's counsel questioned Lurie about the circumstances surrounding the e-mail, prompting Dick's counsel to immediately object the e-mail was an inadvertently disclosed attorney-client communication and demand that Gibson Dunn return its copies as required by *State Fund*.  Gibson Dunn refused to return the Blaskey e-mail, denying that it was privileged and that the *State Fund* rule applied.  Gibson Dunn then further reviewed and analyzed the e-mail to determine its relevance to the claims and defenses in the Malpractice Actions, formulated deposition questions based on the e-mail's content, and deposed May Jo and Teri about the e-mail while reading portions of it into the

record. Gibson Dunn also identified and quoted the e-mail in its interrogatory responses that described evidence supporting Defendants' defenses, produced the e-mail in discovery, and lodged a copy with the trial court in opposition to the privilege motion.

This constitutes substantial evidence supporting the trial court's finding disqualification was necessary to prevent future prejudice or harm to Dick from Gibson Dunn's exploitation of the e-mail's contents. Indeed, this evidence shows Gibson Dunn thought it could use the e-mail to Defendants' advantage in opposing Dick's claims. Why else would Gibson Dunn identify the e-mail as relevant evidence in interrogatory responses and depose Mary Jo and Teri about the e-mail in the face of Dick's strenuous objection that the e-mail was an inadvertently disclosed, privileged document that must be returned? *Clark* established that an attorney who knowingly uses inadvertently disclosed, privileged materials to depose witnesses may affect the outcome of the lawsuit and therefore justifies a trial court's exercise of its discretion to disqualify the attorney. (*Clark*, *supra*, 196 Cal.App.4th at p. 55 & fn. 11.)

Substantial evidence also supports a finding that Gibson Dunn's continued representation of Defendants could trigger doubts about the integrity of the judicial process because whenever Gibson Dunn's advocacy touched on the August 22 meeting summarized in the Blaskey e-mail, questions inevitably would surface about the source of Gibson Dunn's knowledge. (*Clark*, *supra*, 196 Cal.App.4th at pp. 54-55.) Even if Gibson Dunn's knowledge came from a legitimate, nonprivileged source, Gibson Dunn's previous access to the Blaskey e-mail "could undermine the public trust and confidence in the integrity of the adjudicatory process." (*Id*. at p. 55.) On this record, we cannot say the trial court abused its discretion in selecting disqualification as the appropriate remedy for Gibson Dunn's violation of its *State Fund* duties.[13] (*Ibid*.)

_____

[13] The dissent concludes the trial court erred in disqualifying Gibson Dunn because, "until today, no court has ever applied the *State Fund* rule in any case which bears any material resemblance to this case. So here, as in *State Fund*, the disputed

44

Defendants contend the trial court abused its discretion because there is no evidence Dick will suffer any future harm based on Gibson Dunn's review and use of the Blaskey e-mail. According to Defendants, the trial court's privilege order prevents future harm to Dick because it prohibits Gibson Dunn from further using the e-mail by requiring the firm to seal its copies and also those portions of the deposition transcripts that refer to

conduct has never before been condemned by any decision, statute or Rule of Professional Conduct applicable in this state[, and therefore] it may not be equated to a failure to act in good faith such that disqualification is warranted." (Dissent, at p. 10.) The dissent misconstrues *State Fund*, the facts of this case, and the standards for disqualification.

In *State Fund*, the trial court imposed monetary sanctions against an attorney for refusing to return his opponent's inadvertently disclosed, privileged documents. The trial court concluded the attorney's conduct constituted bad faith conduct under Code of Civil Procedure section 128.5 because it violated an American Bar Association (ABA) ethics opinion addressing an attorney's ethical obligations in handling such documents. (*State Fund*, *supra*, 70 Cal.App.4th at 651.) The *State Fund* court reversed the sanctions, explaining the ABA opinion could not serve as a basis for imposing monetary sanctions when no "decision, statute, or Rule of Professional Conduct applicable in this state" previously had condemned the conduct. (*State Fund*, at pp. 655-656.) The *State Fund* court went on to announce the foregoing *State Fund* rule as the standard governing all future conduct by California attorneys. (*Id*. at pp. 656-657.)

In contrast to *State Fund*, when Gibson Dunn engaged in its conduct, numerous decisions prohibited an attorney from excessively reviewing an opponent's inadvertently produced, privileged documents, and held an attorney could be disqualified for violating that prohibition. (See, e.g., *Rico*, *supra*, 42 Cal.4th at p. 810; *Clark*, *supra*, 196 Cal.App.4th at pp. 54-55.) Whether the dissent considers any of those cases to be analogous to the specific facts of this case is irrelevant because *State Fund* and its progeny undeniably prohibit the category of conduct at issue here. Moreover, the trial court impliedly found that Gibson Dunn refused to return the Blaskey e-mail, continued to review it, and used it to depose witnesses in the face of repeated objections and warnings by Dick's attorneys. Substantial evidence supports those findings and they make disqualification a potential remedy for addressing Gibson Dunn's conduct. Finally, contrary to the dissent's suggestion, a trial court is not required to find an attorney acted in bad faith to disqualify the attorney for violating the *State Fund* rule.

45

its contents.  Defendants contend Gibson Dunn has complied with the court's order and therefore disqualification was unnecessary.  Defendants misconstrue the governing law.

As explained above, disqualification does not require evidence of an existing injury from the use of the inadvertently disclosed materials.  (*Clark*, *supra*, 196 Cal.App.4th at p. 55.)  Disqualification is proper as a prophylactic measure to prevent potential future harm to Dick from information Gibson Dunn should not have used.  (*Ibid*.)  The critical question is whether there is a genuine likelihood that Gibson Dunn's review and use of the Blaskey e-mail will affect the outcome of the Malpractice Actions.  (*Oaks Management*, *supra*, 145 Cal.App.4th at p. 467; *Gregori*, *supra*, 207 Cal.App.3d at p. 309.)  We review the trial court's answer to that question for abuse of discretion because the trial court has superior knowledge about the parties' claims and defenses, and the impact of the inadvertently disclosed information on those claims and defenses.  (*Clark*, at pp. 46-47.)

"An abuse of discretion may be found only if '"no judge could have reasonably reached the challenged result.  [Citation.]  '[A]s long as there exists "a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be . . . set aside . . . .'"'"'"  (*O'Donoghue v. Superior Court* (2013) 219 Cal.App.4th 245, 269.)  We may not substitute our judgment for that of the trial court, and provided the trial court properly applied the law, we may reverse the trial court's exercise of its discretion only when the facts required the trial court to reach a different result.  (*Avant! Corp. v. Superior Court* (2000) 79 Cal.App.4th 876, 881-882; *Cahill v. San Diego Gas & Electric Co.* (2011) 194 Cal.App.4th 939, 957.)

The trial court's privilege order prevented Gibson Dunn from using the Blaskey e-mail and the portions of the deposition transcripts that referred to its content.  But the court's order could not prevent Gibson Dunn from using the knowledge it acquired by carefully reviewing and analyzing the e-mail even if the e-mail itself is no longer available to the firm.  (See *Clark*, *supra*, 196 Cal.App.4th at pp. 41-42, 54-55

46

[rejecting contention trial court abused its discretion by disqualifying attorney instead of entering a protective order precluding use of inadvertently disclosed materials].)

Even after a trial court has taken remedial action to protect the privilege, "disqualification still serves the useful purpose of eliminating from the case the attorney who could most effectively exploit the unfair advantage [acquired through the earlier review and use of the inadvertently disclosed, privileged materials]." (*Gregori*, *supra*, 207 Cal.App.3d at p. 309; see *Oaks Management*, *supra*, 145 Cal.App.4th at p. 467.) Here, the Gibson Dunn attorney who received and improperly reviewed the inadvertently disclosed documents has a greater capacity than any replacement counsel to exploit the information contained in those documents because the original attorney has personal knowledge of the information. Any knowledge replacement counsel receives about the documents would be secondhand information received from others who may have seen the documents, and therefore it is unlikely replacement counsel could use the information as effectively. (*Gregori*, at p. 309; *Chronometrics, Inc. v. Sysgen, Inc.* (1980) 110 Cal.App.3d 597, 607-608.)

If we accepted Defendants' argument, a trial court never could disqualify an attorney who received, reviewed, and used inadvertently disclosed, privileged materials unless the attorney continued to review and use the materials after the trial court found them privileged and ordered them returned, sealed, or destroyed. That is not the law. As we have explained, substantial evidence supports the finding that disqualification was appropriate to prevent future harm to Dick despite the privilege order because the Blaskey e-mail included information that Gibson Dunn believed it could use to Defendants' advantage. Moreover, the privilege order does nothing to lessen the damage caused to the public's trust in the administration of justice and the integrity of the bar based on Gibson Dunn's previous access and extensive use of the Blaskey e-mail. On this record, the privilege order did not require the trial court to deny the disqualification motion.

Finally, Defendants contend *Clark* is distinguishable because the attorney there used one of several inadvertently disclosed, privileged documents as the basis for one of his client's claims, and the attorney and client stated they would use the documents at trial even after acknowledging their privileged nature. According to Defendants, those egregious facts are not present here and therefore *Clark* does not support the trial court's decision. Defendants misconstrue *Clark*.

Although the attorney in *Clark* used one of the documents as the basis for the claim, *Clark* explained the trial court did not abuse its discretion in disqualifying the attorney even if that document later was found not to be privileged. *Clark* explained disqualification was appropriate because the attorney also used other privileged documents to question witnesses at their depositions. (*Clark*, *supra*, 196 Cal.App.4th at p. 55 & fn. 11.) Moreover, the statements by the attorney and client that they would use the documents at trial occurred *before* their opponent filed the disqualification motion. (*Id*. at pp. 44, 55 & fn. 11.) Nothing in *Clark* supports Defendants' suggestion disqualification was ordered in that case based on the attorney's or client's allegedly professed intent to use the inadvertently disclosed, privileged documents even after the trial court found they were privileged. *Clark* therefore is not meaningfully different than this case and supports the trial court's exercise of its discretion to disqualify Gibson Dunn.

## III

### DISPOSITION

The petition for writ of mandate or other appropriate relief is denied. This court's order staying all trial court proceedings is dissolved upon the finality of this opinion. Plaintiffs shall recover their costs for the proceedings in this court.


ARONSON, J.

I CONCUR:


O'LEARY, P. J.

**THOMPSON, J.,** Dissenting—I respectfully dissent. The court's decision today is an unwarranted extension of the ethical rule declared in *State Comp. Ins. Fund v. WPS, Inc.* (1999) 70 Cal.App.4th 644 (*State Fund*). The *State Fund* rule does not apply to the unusual situation in this case, but even if it does apply, Gibson Dunn did not violate it. And, in any event, disqualification was not proper because Gibson Dunn's conduct was not clearly proscribed by the *State Fund* rule.

*1. The State Fund Rule Does Not Apply.*

The *State Fund* rule does not apply because the unusual situation in this case bears no material resemblance to the situation in that case. In *State Fund*, the plaintiff's lawyer erroneously sent the privileged documents directly to the defendant's lawyers, together with copies of other documents previously produced during discovery, all in preparation for trial. (*State Fund*, *supra*, 70 Cal.App.4th at p. 648.)

The erroneous disclosure was patently inadvertent and undisputed. (*State Fund*, *supra*, 70 Cal.App.4th at p. 648.) When the defendant's lawyer refused to return the privileged documents, the plaintiff's lawyer promptly sought an order compelling destruction or return of the privileged documents and sanctions. (*Id*. at p. 649.)

In this case, a client, Dick, forwarded the Blaskey e-mail to a nonlawyer, Ninetta, who forwarded it to Gavin, another nonlawyer. Gavin then gave hard copies to Rick, Cox and Pellizzon, all nonlawyers. Gavin also forwarded it to Lurie, who was a lawyer for MHI at that time but is now a client. Lurie put it in the MWE/MHI client file, where it was later found by his lawyers, Gibson Dunn.

The only disclosure in this entire series of disclosures which was even arguably inadvertent was the initial disclosure by Dick to Ninetta. That disclosure was not patently inadvertent, and the claimed inadvertence was subject to reasonable dispute. Furthermore, none of these disclosures occurred in the context of formal discovery or preparation for trial. Instead, they all occurred in the context of an attempt to resolve the MHI dispute without litigation, with Gavin acting as an informal mediator.

1

After these disclosures came to light, Dick's lawyers did very little to secure the destruction or return of all copies of the Blaskey e-mail. Kirby told Dick's lawyers in the Probate Action in August, 2014, that Gavin had given copies to Rick, Cox and Pellizzon. Kirby also told Dick's lawyers, "*I would suspect the disclosure continued beyond my clients and Mr. Pellizzon.*" (Italics added.)

Dick's lawyers claimed Dick had inadvertently disclosed the Blaskey e-mail to Ninetta, and asked Kirby to have Rick and Cox destroy their copies of it. They also asked Kirby to have Rick and Cox contact any third parties who possessed copies and ask them to destroy their copies too, but Kirby refused.

Kirby questioned the inadvertence claim and insisted discovery would be necessary to resolve the privilege claim. He explained: "[T]his is going to be a fact intensive issue about waiver . . . and *the extent of its further distribution by persons other than Dick . . . is currently unknown . . . .* [¶] . . . [¶] . . . Until such time as we can garner all the facts, we will proceed with deleting and destroying all copies *in our possession*, but we will retain a single copy in a sealed envelope for use at your client's continuing deposition and . . . for use at further depositions . . . . [¶] Likewise, we will make sure to request the return of the same from our clients, but *our ethical obligation extends no further than dealing with our own clients*." (Italics added.)

Even so, Dick's lawyers never did anything else to secure the return of the Blaskey e-mail from Rick, Cox or Kirby. More to the point, they never did anything else to determine the extent of further disclosure either to or by other third parties like Lurie.

Gibson Dunn first became aware of the Blaskey e-mail in June 2015, when they found it in the MWE/MHI client file while preparing MWE's response to a subpoena from Dick's lawyers in the Probate Action. Gibson Dunn produced a copy of the Blaskey e-mail to Dick's lawyers in the Probate Action about a month later. Dick's lawyers did absolutely nothing in response. They neither demanded that it be returned nor sought a protective order.

2

These distinctions are material for three reasons. First, the *State Fund* rule "is fundamentally based on the importance which the attorney-client privilege holds in the jurisprudence of this state." (*State Fund*, *supra*, 70 Cal.App.4th at p. 657.) The *State Fund* rule essentially obligates the receiving lawyer to protect the attorney-client privilege for the privilege holder, when the privilege holder's own lawyer is unable to do so because he or she is unaware of the inadvertent disclosure. (*Id*. at pp. 656-657.)

In this case, the privilege holder's own lawyers were aware of the arguably inadvertent disclosure long before the receiving lawyers. Dick's lawyers learned of the arguably inadvertent disclosure in August 2014, almost a year before Gibson Dunn learned of it in June 2015. So Dick's own lawyers were able to protect the attorney-client privilege for Dick but they simply failed to do so. In these circumstances, Gibson Dunn had no obligation to protect the attorney-client privilege for Dick.

Second, the *State Fund* rule is based on the belief, "a client should not enter the attorney-client relationship fearful that an inadvertent error by its counsel could result in the waiver of privileged information . . . ." (*State Fund*, *supra*, 70 Cal.App.4th at p. 657.) "Without it, full disclosure by clients to their counsel would not occur, with the result that the ends of justice would not be properly served." (*Ibid*.)

But none of these policy concerns are implicated here because the arguably inadvertent disclosure was made by the client, Dick, not his lawyer. Client error poses no risk of disincentive to full candor by a client with his or her lawyer out of fear that an inadvertent error by the lawyer could result in the waiver of privileged information.

Third, the *State Fund* rule preserves the rights of attorneys to prepare for trial and, "addresses the practical problem of inadvertent disclosure in the context of today's reality that document production may involve massive numbers of documents." (*Rico v. Mitsubishi Motors Corp.* (2007) 42 Cal.4th 807, 818 (*Rico*).) None of these policy concerns are implicated in this case either because the arguably inadvertent disclosure occurred outside the context of trial preparation and document production.

3

The only case cited by the majority which bears any resemblance to the unusual situation in this case is *Clark v. Superior Court* (2011) 196 Cal.App.4th 37 (*Clark*). And *Clark* is only similar in one respect. There, as here, the attorney received the privileged documents from his own client, not from the opposing attorney. The *Clark* court merely assumed the *State Fund* rule applied and analyzed whether it was violated.

Regardless, *Clark* is easily distinguished. In *Clark* the client had taken the privileged documents from his employer in violation of a nondisclosure agreement. So the client's acquisition and possession of the privileged documents was itself wrongful. The same cannot be said here. There was nothing wrongful about Lurie's acquisition or possession of the Blaskey e-mail.

*Great American Assurance Co. v. Liberty Surplus Insurance Corp.* (N.D. Cal. 2009) 669 F.Supp.2d 1084 (*Great American*) illustrates why the *State Fund* rule does not apply under these circumstances. There, the defendant insurer's claims specialist forwarded a privileged coverage counsel opinion to the outside insurance broker for a business claiming coverage. (*Id*. at p. 1088.) The broker then sent the opinion to the plaintiff, the business's primary insurer. The defendant claimed it did not become aware of the inadvertent disclosure until a month later, at which point it sought to recover the opinion, but the plaintiff refused. (*Ibid*.) Coverage litigation ensued and the plaintiff produced, from its claims file, a copy of the opinion. (*Id*. at p. 1089.) The plaintiff also attached a copy of the opinion to its motion for summary judgment. (*Ibid*.)

The *Great American* court concluded the *State Fund* rule did not apply because the plaintiff "did not receive any communication directly from [the defendant]," making this situation "much different from a case wherein some privileged or work-product protected documents, part of a larger set of documents, were inadvertently sent with the larger set, thus indicating that it might be a mistake." (*Great American*, *supra*, 669 F.Supp.2d at p. 1093.) Instead there, as here, "a single document was sent, and it was not sent directly to opposing counsel." (*Ibid*.)

4

The *Great American* court explained, "it was not reasonably apparent that the coverage opinion was inadvertently sent. In fact, it may have been reasonably apparent that any privilege or protection was waived." (*Great American*, *supra*, 669 F.Supp.2d at p. 1093.) The court emphasized the defendant did not raise the issue of inadvertent disclosure for well over a month after it came to light. (*Ibid*.) Thus, the defendant's counsel "would have had little reason to think that the original email was not voluntarily sent." (*Ibid*.) All of the same is true here and the same result should obtain.

This result also makes sense. The *State Fund* rule prevents "'a "gotcha" theory of waiver, in which an underling's slip-up in a document production becomes the equivalent of actual consent [to waive the privilege].'" (*State Fund*, *supra*, 70 Cal.App.4th at p. 654.) But extending the *State Fund* rule to the unusual situation here results in a reverse gotcha which could "nullify a party's right to representation by chosen counsel any time inadvertence or devious design put an adversary's confidences in any attorney's mailbox." (*Id.* at p. 657.) "Protecting the integrity of judicial proceedings does not require so draconian a rule." (*Ibid*.)

For all of these reasons the *State Fund* rule does not apply in this case as a matter of law. (*Ghirardo v. Antonioli* (2007) 8 Cal.4th 791, 799 [when the decisive facts are undisputed we are confronted with a question of law].) Gibson Dunn's discovery of the Blaskey e-mail in the MWE/MHI client file is plainly too far removed from Dick's arguably inadvertent disclosure to Ninetta. The majority is not just trying to put a square peg in a round hole. They are trying to put a square peg in no hole at all.

*2. Gibson Dunn Did Not Violate The State Fund Rule.*

Gibson Dunn did not violate the *State Fund* rule for two reasons. First, Gibson Dunn's *State Fund* obligations were never triggered because it was not reasonably apparent that the Blaskey e-mail was provided or made available through inadvertence. Second, even if Gibson Dunn's *State Fund* obligations were triggered they were discharged when Gibson Dunn produced the Blaskey e-mail to Dick's lawyers.

5

As a preliminary procedural matter, I note the trial court never expressly determined that Gibson Dunn's *State Fund* obligations were triggered, or that Gibson Dunn violated those obligations through its use of the Blaskey e-mail. In fact, the trial court never made any express findings at all regarding Gibson Dunn's asserted *State Fund* obligations or violations.

The majority would rely upon the doctrine of implied findings and the presumption of correctness to overcome these procedural defects. This they cannot do. "[W]here, as here, a respondent argues for affirmance based on substantial evidence, the record must show the court *actually performed* the factfinding function. Where the record demonstrates the trial judge did not weigh the evidence, the presumption of correctness is overcome. [Citation.] As stated in *Estate of Larson* (1980) 106 Cal.App.3d 560, 567, 'The [substantial evidence] rule thu operates only where it can be presumed that the court has performed its function of weighing the evidence. If analysis of the record suggests the contrary, the rule should not be invoked.'" (*Kemp Bros. Construction, Inc. v. Titan Electric Corp.* (2007) 146 Cal.App.4th 1474, 1477-1478.)

Such is the case before us. The record demonstrates the trial court never weighed the evidence and performed the fact finding function regarding Gibson Dunn's asserted *State Fund* obligations. Instead, it improvidently collapsed the three-part *State Fund* inquiry into two parts: (1) the predicate inquiry as to whether the Blaskey e-mail was privileged; and (2) the subsequent inquiry as to whether disqualification was necessary. These procedural defects alone warrant issuing the requested writ relief.

Turning to the merits, Gibson Dunn's *State Fund* obligations were not triggered when they found the Blaskey e-mail in the MWE/MHI client file because it was not, "reasonably apparent that the materials were provided or made available through inadvertence . . . ." (*State Fund*, *supra*, 70 Cal.App.4th at p. 656.) This part of the *State Fund* rule states an objective standard, and in applying it "courts must consider . . . the circumstances of the litigation . . . ." (*Rico*, *supra*, 42 Cal.4th at p. 818.)

6

The burden of proof rested squarely on Dick's lawyers—not Gibson Dunn. *State Fund* requires, "whenever a lawyer seeks to hold another lawyer accountable for misuse of inadvertently received confidential materials, the burden must rest on the *complaining lawyer to persuasively demonstrate inadvertence*." (*State Fund*, *supra*, 70 Cal.App.4th at p. 657, italics added; accord *Rico*, *supra*, 42 Cal.4th at p. 817.)

In this case, the relevant objective circumstances of the litigation are:

• Gibson Dunn received the Blaskey e-mail from its own client, Lurie, who innocently received it from a third party, Gavin, not from the privilege holder, Dick, or from Dick's lawyers. Again this unusual situation is nothing like *State Fund* or *Clark*.

• The Blaskey e-mail stated it was a "Summary of [the] 8/22/13 meeting," a meeting attended by Dick, Rick, Cox, Blaskey and Lurie. That Lurie had a copy of the Blaskey e-mail was unremarkable since he had attended the meeting as MHI's lawyer.

• The Blaskey e-mail, unlike the *State Fund* and *Clark* documents, was not labeled with privilege or confidentiality warnings. (*State Fund*, *supra*, 70 Cal.App.4th at p. 648 ["Attorney-Client Communication/Attorney Work Product . . . Do Not Circulate or Duplicate . . . Confidential"] (capitalization omitted); *Clark*, *supra*, 196 Cal.App.4th at p. 43 ["'Attorney-Client Privileged' . . . 'Highly Confidential'"].) Thus, the Blaskey e-mail did not "make clear to even a casual observer that [it was] intended to be [a] confidential attorney-client communication[]." (*State Fund*, *supra*, 70 Cal.App.4th at p. 653.)

• The Blaskey e-mail was addressed to Dick and to Jill Lindsay. Lindsay was, "MHI's longtime bookkeeper" according to the allegations of the complaints in the Malpractice Actions served on May 4, 2015, over a month before Gibson Dunn found the Blaskey e-mail in the MWE/MHI client file. Gibson Dunn first learned Lindsay also claimed to be Dick's "personal assistant" on August 19, 2015, about three months after Gibson Dunn found the Blaskey e-mail. Up until then Gibson Dunn had no reason to even suspect it might have been "reasonably necessary" (Evid. Code, § 952) to address the Blaskey e-mail to Dick and to Lindsay.

7

• Unlike in *Rico*, no Gibson Dunn attorney ever "admitted that after a minute or two of review he realized . . . [opposing counsel] did not intend to reveal them." (*Rico*, *supra*, 42 Cal.4th at p. 819.)  This fact is relevant, although "such admissions are not required for the application of the objective standard . . . ." (*Ibid*.)

• Dick forwarded the Blaskey e-mail to "Mr. & Mrs. Gavin Shearer Herbert," at Ninetta's e-mail address, at a time when everyone involved knew Gavin, Dick's brother-in-law, was trying to mediate the MHI dispute.  These circumstances suggested Dick had deliberately forwarded it to Ninetta, who is Gavin's wife.

• At the time that Gibson Dunn found the Blaskey e-mail in the MWE/MHI client file:  it had been nearly two years since Lurie had received it from Gavin; it had been almost one year since Dick's lawyer's had been told it had been distributed to third parties other than Rick, Cox, Kirby and Pellizzon; and neither Dick nor his lawyers had ever raised any concerns about it with either Lurie or Gibson Dunn.

On this record, there is no reasonable basis to conclude Dick's lawyers met their burden to persuasively demonstrate inadvertence based upon the relevant objective litigation circumstances.  Hence, even if the trial court had made a factual finding on the inadvertence issue, that finding would not have been supported by substantial evidence.

The majority's arguments for the opposite conclusion are legally unsound.  The majority improperly equates the presumption of privilege (Evid. Code, § 917, subd. (a)), with a presumption of inadvertence.  By doing so, the majority, like the trial court, collapses the three-part *State Fund* inquiry into two parts, and effectively reads the reasonably apparent inadvertence requirement out of the rule.  There is no presumption of inadvertence, and even if there were a presumption of inadvertence it was rebutted here.

Next the majority relies on evidence of events which occurred after Gibson Dunn found it had received the Blaskey e-mail.  This evidence is irrelevant.  Gibson Dunn's *State Fund* obligations were triggered, if at all, at the time Gibson Dunn found it had *received* the privileged document. (*State Fund*, *supra*, 70 Cal.App.4th at p. 656.)

8

The majority also argues "counsel's warning on privilege holder's behalf *triggers* an opposing attorney's *State Fund* duties." (Maj. opn. at p. 34, italics added; citing *Clark*, *supra*, 196 Cal.App.4th at pp. 52-53.) The majority's reliance on *Clark* is misplaced. *Clark* was addressing the question of whether the attorney had excessively reviewed the privileged documents in violation of the obligations imposed by *State Fund*, not the question of whether those obligations had been triggered in the first instance.

Besides, Gibson Dunn discharged their *State Fund* obligations, if any, when they produced the Blaskey e-mail. *State Fund* declares the receiving attorney "should refrain from examining the materials any more than is essential to ascertain if the materials are privileged, and shall immediately notify the sender that he or she possesses material that appears to be privileged." (*State Fund*, *supra*, 70 Cal.App.4th at p. 656.)

Gibson Dunn notified Dick's lawyers they possessed the Blaskey e-mail when they produced it in response to Dick's subpoena, and again when Rick's lawyers questioned Lurie about it during his deposition. And there is no evidence Gibson Dunn examined it any more than necessary prior to notifying Dick's lawyers they had it.

At that point, Gibson Dunn's *State Fund* obligations, if any, were discharged, and the burden shifted to Dick's lawyers. Since the parties could not resolve the situation by agreement, Dick's lawyers were obligated to promptly seek guidance from the court, "with the benefit of protective orders and other judicial intervention as may be justified." (*State Fund*, *supra*, 70 Cal.App.4th at p. 657.) This is exactly what the plaintiff's lawyers did in *State Fund* and what Dick's lawyers failed to do here.

The contrary conclusion by the majority upsets the delicate balance of competing interests struck in *State Fund*. (See *State Fund*, *supra*, 70 Cal.App.4th at p. 657.) It imposes on Gibson Dunn an obligation to respect their opponent's interests which is greater than and in direct conflict with their primary obligation to zealously represent their own client's interests. It penalizes Gibson Dunn for Dick's lawyer's failure to represent Dick's interests. This cannot be what the *State Fund* rule requires.

9

*3. Disqualification Was Not Proper.*

Disqualification was not proper because Gibson Dunn's conduct was not clearly proscribed by the *State Fund* rule. On this point, *State Fund* is analogous.

In *State Fund,* the trial court awarded sanctions against the defendant's lawyer, for refusing to return and for using the privileged documents in violation of an American Bar Association (ABA) ethics opinion. (*State Fund*, *supra*, 70 Cal.App.4th at p. 651.) The Court of Appeal reversed and explained the lawyer should not have been sanctioned for engaging in conduct, "which has not been condemned by any decision, statute or Rule of Professional Conduct applicable in this state. The finding that an attorney has engaged in conduct contrary to an ABA formal opinion does not establish an obligatory standard of conduct imposed on California lawyers. Consequently it may not perforce be equated to a failure to act in good faith such that sanctions are warranted." (*Id*. at p. 656.)

Similarly, the trial court here granted Dick's motion to disqualify Gibson Dunn, for refusing to return the Blaskey e-mail and for allegedly using it in violation of their obligations under *State Fund*. But until today, no court has ever applied the *State Fund* rule in any case which bears any material resemblance to this case. So here, as in *State Fund*, the disputed conduct has never before been condemned by any decision, statute or Rule of Professional Conduct applicable in this state. Consequently, it may not be equated to a failure to act in good faith such that disqualification is warranted.

In the final analysis this was an unusual privilege dispute. Gibson Dunn's conduct was objectively reasonable. That this court has now greatly expanded the *State Fund* rule to condemn Gibson Dunn's conduct is not a proper basis for disqualification.


THOMPSON, J.

10